**Harold G. CHILDS, Appellee,**

v.

**STATE OF OREGON and James C. Holzman, Director of Department of Public Safety of Multnomah County, Albert B. Green, Director, Department of Judicial Administration of Multnomah County, and George Van Hoomissen, District Attorney of Multnomah County, Oregon, Appellant.**

**No. 24770.**

United States Court of Appeals, Ninth Circuit.

Aug. 4, 1970.

Rehearing Denied Sept. 1, 1970.

Duniway, Circuit Judge, dissented and filed opinion.

Al J. Laue (argued), Asst. Atty. Gen., Jacob B. Tanzer, Sol. Gen., Lee Johnson, Atty. Gen., Dept. of Justice, Salem, Or., George Van Hoomissen, Dist. Atty., Billy L. Williamson, Deputy Dist. Atty., Portland, Or., for appellant.

Paul R. Meyer (argued), of Kobin & Meyer, Portland, Or., for appellee.

Before DUNIWAY, WRIGHT and TRASK, Circuit Judges.

TRASK, Circuit Judge:

The State of Oregon brings this appeal from a judgment of the district court granting a writ of habeas corpus to Harold G. Childs. The court's opinion is reported at 300 F.Supp. 649 (D.Ore. 1969).

Childs, operator of a cigar store in Portland, Oregon, was convicted at jury trial in the Circuit Court of Multnomah County, Oregon, of disseminating obscene matter in violation of O.R.S. § 167.151 [1] following his sale of a copy of the paperback book, "Lesbian Roommate", to a Portland police officer. His conviction was affirmed by the Oregon Supreme Court. State v. Childs, Or., 447 P.2d 304 (1968). That court's opinion describes the contents of the book in detail. The court held, among other things, that, applying the obscenity tests announced by the Supreme Court in A Book Named "John Clelands Memoirs" v. Massachusetts, 383 U.S. 413, 418, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966), the book was not constitutionally protected as a matter of law. A petition for certiorari to the United States Supreme Court was denied. Childs v. Oregon, 394 U.S. 931, 89 S.Ct. 1198, 22 L.Ed.2d 460 (1969).

Childs then petitioned the district court for habeas corpus relief, alleging that he "was found guilty by the application of standards for judging obscenity which are in violation of the First and Fourteenth Amendments and in direct contradiction of the applicable decisions for judging obscenity." The district judge determined that the Oregon Supreme Court misinterpreted the United States Supreme Court's definition of "prurient interest." He stated:

"The Oregon Supreme Court held that the book's 'obvious purpose

1. "(1) No person shall knowingly disseminate obscene matter. A person disseminates obscene matter if he exhibits, sells, delivers or provides, or offers or agrees to exhibit, sell, deliver or provide, or has in his possession with intent to exhibit, sell, deliver or provide any obscene writing, picture, motion picture, device, record, material or other representation or embodiment of the obscene.

"(2) As used in subsection (1) of this section, matter is obscene if, considered as a whole, its predominant theme appeals to prurient interest and if it is patently offensive and goes substantially beyond the customary limits of candor in describing or representing such matter with reference to ordinary persons.

"(3) In any prosecution for an offense under this section, evidence shall be admissible, as relevant to a determination of whether or not the predominant theme of the matter appeals to prurient interest, to show artistic, literary, scientific or educational merit of the matter.

"(4) In any prosecution for a violation of this section, it shall be relevant on the issue of knowledge to prove the advertising, publicity, promotion, method of handling or labelling of the matter, including any statement on the cover or back of any book or magazine.

"(5) Violation of subsection (1) of this section is punishable by imprisonment in the county jail for not more than six months, or a fine of not more than $1,000, or both."

\* \* \* is to stimulate the reader sexually.' 447 P.2d at 306. 'The entire book,' the Court said, 'is for the purpose of inciting lascivious thoughts and arousing lustful desires.' 447 P. 2d at 307. This does not satisfy the requirement of appeal to prurient interest. A 'prurient interest' is a 'shameful or morbid interest in nudity, sex or excretion.' Roth v. United States, 354 U.S. 476, 487, n. 20, 77 S.Ct. 1304, 1310, 1 L.Ed.2d 1498 (1957)." 300 F.Supp. at 650.

He then found that "Lesbian Roommate" does not appeal to a "prurient interest", and is therefore not obscene.

We consider that the Oregon state courts correctly applied the Supreme Court's definition of "prurient interest."

"Obscene material" was defined in Roth v. United States, 354 U.S. 476, 487, 77 S.Ct. 1304, 1310, 1 L.Ed.2d 1498 (1957), as "material which deals with sex in a manner appealing to prurient interest." That phrase was, in turn, defined in footnote twenty to the Court's opinion. That footnote reads as follows in its entirety:

"I. e., material having a tendency to excite lustful thoughts. Webster's New International Dictionary (Unabridged, 2d ed., 1949) defines *prurient*, in pertinent part, as follows:

" ' \* \* \* Itching; longing; uneasy with desire or longing; or persons, having itching, morbid, or lascivious longings; of desire, curiosity, or propensity, lewd \* \* \*.'

"*Pruriency* is defined in pertinent part, as follows:

' \* \* \* Quality of being prurient; lascivious desire or thought. \* \* \*'

"See also Mutual Film Corp. v. Industrial Comm., 236 U.S. 230, 242, 35 S.Ct. 387, 390, 59 L.Ed. 552 where this Court said as to motion pictures:

' \* \* \* They take their attraction from the general interest, eager and wholesome it may be, in their subjects, but a *prurient interest may be excited and appealed to \* \* \*.'* (Emphasis added.)

"We perceive no significant difference between the meaning of obscenity developed in the case law and the definition of the A.L.I., Model Penal Code, § 207.10(2) (Tent. Draft No. 6, 1957), *viz:*

' \* \* \* A thing is obscene if, considered as a whole, its predominant appeal is to prurient interest, i.e., a shameful or morbid interest in nudity, sex, or excretion, and if it goes substantially beyond customary limits of candor in description or representation of such matters. \* \* \*' See Comment, *id.,* at 10, and the discussion at page 29 et seq."

The Oregon trial judge adopted the ALI Model Penal Code definition in his charge to the jury in this case. He said:

"Referring back to the question of social importance, you should know that there may be social importance in ideas, whether the idea is conventional or shared by a majority of people or not, and even though you find that a book has no social importance within all of these definitions and substantially goes beyond the customary limits of candor in the description of sexual matters in our national community, you still may not consider it obscene, unless you find also, beyond a reasonable doubt, that the book appeals to the prurient interest, as I will define that for you.

"Now, the term 'prurient interest' does not mean a mere interest in sex or a mere arousal of sexual interest. Prurient interest is a shameful or morbid interest in nudity, sex or excretion, and you must measure this appeal by the average and ordinary adult.

"In order for you to find the book to be obscene—a particular book to be obscene—you must find from the evidence beyond reasonable doubt that the predominant theme of the book considered as a whole appeals to the prurient interest with reference to the ordinary and average adult, again ap-

plying the contemporary national community standards, and whether the book appeals to a prurient interest or not, you should consider the book as a whole, and not merely excerpted passages or matters less than the entire book."

We are convinced that, although the Oregon Supreme Court's opinion does not contain the phrase, "shameful or morbid interest in nudity, sex or excretion", the court applied that standard. The court previously had adopted that standard in State v. Jackson, 224 Or. 337, 356 P.2d 495, 507 (1960):

"The majority opinion in the Roth case defines 'prurient' as 'having a tendency to excite lustful thoughts.' 354 U.S. 476, at page 486, note 20, 77 S.Ct. at page 1310. We think, however, that the court had in mind the narrower meaning used by the Model Penal Code or means to use the narrower meaning in cases following Roth. See Times Film Corporation v. City of Chicago, 355 U.S. 35, 78 S.Ct. 115, 2 L.Ed.2d 72, reversing 7 Cir., 1957, 244 F.2d 432.

"We accept the American Law Institute's definition of obscenity as a proper standard for Oregon courts to follow."

The Court in *Childs* was not unmindful of *Jackson,* and cited it for another proposition. See 447 P.2d at 308.[2]

Even if *Childs* is read as a departure from Jackson in that it defines "prurient interest" in terms of "lascivious thoughts" and "lustful desires"[3] we do not view this definition as impermissible in light of Roth v. United States, *supra,* 354 U.S. at 487 n.20, 77 S.Ct. 1304.

At least two other federal courts, relying on *Roth,* have adopted similar definitions. Flying Eagle Publications v. United States, 273 F.2d 799, 803 (1st Cir. 1960); United States v. Keller, 259 F.2d 54, 58 (3d Cir. 1958).

We hold that both the trial court, in its instructions to the jury, and the Oregon Supreme Court applied the proper federal constitutional standards in this case.

We also consider that we are obligated to make an independent, *de novo* constitutional judgment on the facts of the case as to whether the material involved is constitutionally protected. Jacobellis v. Ohio, 378 U.S. 184, 189–190, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964).[4] The fact that this case reaches us on review from a petition for habeas corpus after having been considered by *four*[5] previous courts does not appear to diminish our obligation.

2. The Oregon Supreme Court in *Childs* took notice of and applied the "appeal to prurient interest" test. The court stated in its carefully documented and complete opinion:
   "The United States Supreme Court has held that before material may be classified as obscene it must meet each and every one of three requirements. [citing cases] *First, the dominant theme of the material taken as a whole must appeal to a prurient interest in sex.* Second, the material must be patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters. Third, the material must be utterly without redeeming social value." (Emphasis supplied). 447 P. 2d at 306.
   The court then continued for several paragraphs in detailing its reasoning with respect to the finding that the material in

this case does appeal to a prurient interest in sex and in documenting that reasoning with convincing references to the text.

3. 447 P.2d at 307, 310.

4. *See also,* Brown v. Allen, 344 U.S. 443, 506–507, 73 S.Ct. 397, 97 L.Ed. 469 (1953); *Developments in the Law—Federal Habeas Corpus,* 83 HARV.L.REV. 1038, 1113 (1970).

5. First, a jury of representative citizens in the trial court found the book obscene; the trial judge did not set aside the verdict; second, the Supreme Court of Oregon found it obscene; third, The Supreme Court of the United States must have given it some consideration although its denial of certiorari has no significance on the merits; and fourth, the District Court considered it on a habeas petition and reviewed the merits.

"[A]n independent review of the questioned material to determine whether it is 'obscene' within the constitutional requirements is now the obligation of *every judge and appellate court before whom the constitutional issue is raised * * *.*" Lockhart and McClure, *Censorship of Obscenity: The Developing Constitutional Standards*, 45 MINN.L.REV. 5, 114 (1960). (Emphasis supplied).

"This obligation—to reach an independent judgment in applying constitutional standards and criteria to constitutional issues that may be cast by lower courts 'in the form of determinations of fact'—appears fully applicable to findings of obscenity by juries, trial courts, and administrative agencies. The Supreme Court is subject to that obligation, *as is every court before which the constitutional issue is raised.*" *Id.* at 116, quoted in Jacobellis v. Ohio, *supra*, 378 U.S. at 188 n.3, 84 S.Ct. at 1678. (Emphasis supplied).

This court has made *de novo* determinations of obscenity in state habeas corpus cases on several occasions. See, e. g., Pinkus v. Pitchess, 429 F.2d 416 (9th Cir. June 29, 1970); Culbertson v. California, 385 F.2d 209 (9th Cir. 1967); Wenzler v. Pitchess, 359 F.2d 402 (9th Cir. 1966), cert. denied, 388 U.S. 912, 87 S.Ct. 2096, 18 L.Ed.2d 1351 (1967).

Applying the three-pronged test announced in Memoirs v. Massachusetts, *supra*, 383 U.S. at 418, 86 S.Ct. 975, and in Redrup v. New York, 386 U.S. 767, 770, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967), we find that the dominant theme of the book in question, taken as a whole, appeals to a prurient interest in sex, that the book is patently offensive because it affronts contemporary national community standards relating to the description or representation of sexual matters, that it is utterly without redeeming social value, and that these elements coalesce in the book.

■ In a close case—which we do not concede this to be—evidence of pandering [6] may be considered in determining whether the elements of the *Memoirs* test have been met. Ginzburg v. United States, 383 U.S. 463, 470, 86 S.Ct. 942, 16 L.Ed.2d 31 (1965); United States v. Baranov, 418 F.2d 1051, 1053 (9th Cir. 1969).

There is considerable evidence of pandering in this case. A color drawing of two nude women, one reclining on a bed, appears on the front cover of the book, with a capitalized quotation as follows:

"THEY SLASHED EACH OTHER WITH THE SAVAGERY OF PERVERTED DESIRES.

" 'BEAT ME!' SHE CRIED."

The book's back cover contains a three-quarter page photograph of the upper half of the body of a woman, clad only in an inadequate brassiere. Below the photograph is a caption, as follows:

"Betty was rich and perverted. Her need for another woman's love was so great that she was willing to descend from her upper crust life to the sordidness of a cheap rented room and third rate job * * * just so she could have a lesbian roommate. But when her darling took a liking to men, Betty turned to a savage beast."

The book is thus deliberately represented as erotically arousing. The cover emphasizes appeal to the prurient interest rather than having intellectual content or social importance. "Where the purveyor's sole emphasis is on the sexually provocative aspects of his publications, that fact may be decisive in the determination of obscenity." Ginzburg, *supra*, 383 U.S. at 470, 86 S.Ct. at 947. In addition, there is evidence that the de-

---

6. Pandering has been defined as "the business of purveying textual or graphic matter openly advertised to appeal to the erotic interest of [the purveyor's] customers." Roth v. United States, *supra*, 354 U.S. at 495–496, 77 S.Ct. at 1314 (1957) (Warren, C. J., concurring).

fendant openly exhibited them and sold them as part of his stock of "dirtier books." [7]

■ We think this evidence of pandering resolves all ambiguity and doubt, if any, in favor of a finding of obscenity. We therefore hold that "Lesbian Roommate" is obscene, and is not entitled to the protection for free expression that is guaranteed by the First and Fourteenth Amendments.[8]

The order releasing appellee from probation is reversed and the case is remanded to the District Court for consideration of the other contentions raised in appellee's petition.

DUNIWAY, Circuit Judge:

I dissent. Like my brothers, I have done what the Supreme Court says is my duty; I have read the book. My opinion of it is as low as theirs. I would characterize it in the way that this court characterized similar books in Grant v. United States, 9 Cir., 1967, 380 F.2d 748, as "rotten," "obsessed with sex," (both hetero- and homo, normal and abnormal) and "junk." Its redeeming social value is not apparent to me.

In Redrup v. New York, 1967, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515, the various approaches taken by the Justices of the Court to the problem of defining obscenity are succinctly summarized. If I were to apply my own interpretation of the words used in *Redrup* to the book that is before us, I would have no difficulty in agreeing with my brothers in holding that the book is obscene. But the words are far from precise. So I look to what the Supreme Court has done to find clues to what its words mean. Having done so, I must conclude, as we did in *Grant*, that this book is "obviously about the same as those dealt with in *Redrup*" and in the other cases there cited. See also Culbertson v. California, 9 Cir., 1967, 385 F.2d 209; Potomac News Co. v. United States, 1967, 389 U.S. 47, 88 S.Ct. 233, 19 L.Ed. 2d 46, reversing, United States v. 56 Cartons Containing etc., 4 Cir., 1967, 373 F.2d 635; Luros v. United States, 8 Cir., 1968, 389 F.2d 200, 204–206.

I conclude that I must vote to affirm.

### APPENDIX TO OPINION OF THE COURT

Beginning at page 26 of text:

Without looking at Max, Sadie slipped out of the dress and walked over and sat down on the mat. She was disappointed because there weren't any other men or women in the room. She would have liked the action, and the pay would have been a hell of a lot better. At least fifty bucks, and the single posing crap wasn't much fun and she would be lucky if Max slipped her a twenty. The bastard was getting rich, by damn!

She looked up, wondering why Max wasn't fooling with his stupid lights and cameras. She let out a little squeal. "Hey!"

---

7. When officer Prunk went to the defendant's store to investigate he asked the defendant where the defendant kept the "dirtier books." (R.T. 243). The defendant identified a particular rack where they were kept and volunteered that the "worst ones" were obtained from out of town and kept in this group. (R.T. 244).

There is also evidence of pandering by the "originator" (see Ginzburg, 383 U.S. at 467, 86 S.Ct. 942.) The advertising material inside the back cover leaves no doubt as to the market to which the book is directed.

8. The district court in finding the book not constitutionally obscene stated that "the book does not dwell on particular aspects of love making. Its sexual episodes are relevant to the plot and *are described in broad and general language.* Detail depends on the *reader's imagination and inferences he is able to draw.*" (Emphasis supplied.)

The characterization by the district court of the flavor of the book is expressed in customary objective and detached observations. In view of the disparate conclusions reached by that court and this on the ultimate issue of constitutional obscenity we reluctantly attach as an appendix to this opinion two excerpts from the text which we find typical of the episodes which are tacked together by the flimsiest of plot to simulate a story.

"Any objections?" Max snapped. He was already naked, his eagerness for quick action very evident.

"Hell, no! But I thought you didn't have anything to do with us girls!"

"Just shut up," Max said, reaching for her, toppling her over on the mat.

Sadie didn't say any more, but she thought plenty. She hardly had a chance to get in position. Who would have thought it! The always cool and calm boss, acting bored while he took pictures, and now this. The old guy sure came on like a bull, though. Yeah, he was some stud. Jeezus!

Max pistoned his body against her warm, yielding flesh in a feverish attempt to blot out the ugly thoughts in his mind. He felt the arms tighten around his neck, trying to bring his mouth to the seeking red lips. He snarled a warning, the passionate young whore understood, and he knew she hated him for it. Kiss her? The lousy slut!

Sadie could hate with her mind, but she could only love with her body. She might as well be realistic about it. A lot of guys wouldn't kiss her on the mouth, even if they would kiss her other places. Old Max certainly had a good body for his age. A little heavy, but his smooth skin could be that of a young guy. Jeezus! He was really a going s. o. b.

She arched, tightened muscles, groaned. "Yeah," she breathed. "Yeah, yeah, awwwwwww—"

He wasn't going to make it. Max knew the sad fact, but he kept on going. At least, his mind was detached from the squirming girl. He felt a little tenderness for her. She enjoyed it even if [sic] she did hate him. She was a slave to her body and it was really fortunate for her that she didn't mind that fact. But enough was enough.

"Wow!" Sadie stretched out on her side, flicked her eyes admiringly. "You really must have been a man in your younger days. Not that I don't think —well, you know what I mean."

Max was on his back, his eyes closed. Maybe he wouldn't fire the kid, after all. Just tell her to keep her mouth shut. Give her the two hundred—plus the two bucks—and she would probably go for a week with scotch tape over her lips."

Sadie suddenly didn't hate Max. Poor guy. She knew what to do, though. She knew what to try. Max felt the long hair on his chest, then on his stomach. He gasped, and then sighed, wishing he could let himself go. How wonderful it must be to—he thought of Jill Reynolds, suddenly afraid of what he might do to her.

Several minutes passed. "Maybe if—" Sadie broke off, her eyes gleaming.

Max read her meaning in her eyes. He shoved her away roughly, scrambled to his feet. He felt dizzy as the terrible hungers gripped his very being. He cursed, knowing that by his actions— the flicker of desire she had caught in his eyes—Sadie knew his secret, his shame. He heard her knowing laugh, felt her pushing him down.

Sadie stood with her hands on her hips, legs far apart. "Go ahead," she said, mockingly. "Sadie understands. Sadie knows what all men really like. What are you waiting for? It will be our little secret, huh?" She hunched forward, "Go, old man, go—"

Beginning at page 65 of text:

"There are many ways to make love," Betty said.

"That's what you said before. Are you hinting?"

Betty turned over on her side, facing Jill, but still not touching. "And if I am?"

"I've always thought that part of living was trying new things," Jill said. "Besides, I'm curious."

Jill's curiosity was satisfied almost immediately. At least, she was suddenly finding out what it was like to be kissed by a woman. She hadn't realized that she was going to be kissed on the mouth. She had a vague idea that the

kisses would start some place else—and right away. She kept her mouth closed.

"Relax," Betty whispered.

Jill decided that was the silliest request—or order—she had ever heard. Her entire body seemed to be tensed into nothing but a bundle of muscles—or nerves. She was tingling like crazy, though.

Betty's lips were on hers again. The lips were parted and the hot tongue was prying demandingly. It was so strange. The *woman's* lips were so sweet and soft. The busy *woman's* hands were unlike a man's too. Stroking, caressing her breasts, bringing them alive. Then a warm and smooth leg was thrown over her body.

Jill opened her mouth, felt the tongue dart inside, met it with her own. So strange. The hands squeezed her breasts, the warm thigh moved against her body, and Jill found herself wildly excited. She pushed her body against the warm thigh and returned the kiss passionately.

The hands moved along her sides, fingers trailing lightly, and then the moist parted lips were on her left breast. She gasped as her erect nipple was drawn into the hot mouth, the hot tongue danced in crazy little circles around and around. Then Betty was doing the same thing to the right breast."

"I'm on fire," Jill whispered.

Betty raised her head. "I'll put the fire out honey." She probed gently with her fingers. "Is it all right if I put the light on, Jill? I like to see."

"Not now," Jill gasped. "I can't wait, Betty. Just do what—whatever you're going to do!"

Betty laughed happily. "You're so sweet, honey, you're so damn sweet."

Jill had her arms straight down by her sides. Her hands were clinched into fists. She could feel Betty's body on her right, pressing, but she didn't move either hand. She didn't think she really wanted to *touch* Betty. She didn't want to cross a certain line. Even now she was tempted to call a halt.

It wouldn't be fair, though. Not to Betty. The dark-haired girl was moving lower. The lips were moving lower. The tongue was darting. Jill groaned. Betty stopped, told her to relax and not to worry. Jill moaned. How could she relax? Just how in hell did Betty think she could relax?

The tongue was on her stomach. Darting here and there. Hands were reaching and grabbing her breasts. Not hurting —just giving pleasure. As the lips and tongue were giving pleasure. Jill arched her hips. But she kept her hands clenched at her sides. Was she supposed to be doing something with her hands? Why didn't Betty get on with whatever she meant to do?

It entered her mind that this was the time when she needed Paul. Or any male, she thought wildly. Betty's hands had slipped down and around. Now fingers were gripping her buttocks. Jill decided she just had to do something. She *was* on fire! She unclenched her hands. Maybe she would have to do what she had always tried not to do.

Jill rotated her hips, thrust upward, started to move her hands. But she didn't reach her goal. She felt the hot breath, and her hands were suddenly entangling in Betty's rather short hair. Then she was crying out with pleasure, pushing herself greedily against the equally greedy Betty.

Jill heard the sobs spilling from her own parted lips. She heard the syrupy noises that were causing those sobs of pleasure. Then she heard the words telling Betty that it was time. Then it *was* time and she was thankful that Betty was such an artist, so skilled, such an expert at enabling her to drain the very last drop of pleasure out of the wondrous happening.