296 So.2d 218

**In re J. L. PIERCE**

**v.**

**The STATE of Alabama.**

**Ex parte J. L. Pierce.**

**SC 483.**

Supreme Court of Alabama.

May 9, 1974.

Rehearing Denied June 6, 1974.

J. Paul Lowery, Montgomery, Robert Eugene Smith, D. Freeman Hutton, Atlanta, Ga., for petitioner.

William J. Baxley, Atty. Gen. and George M. Van Tassel, Jr., Asst. Atty. Gen., and Francis A. Poggi, Jr., Sp. Asst. Atty. Gen., for the state.

HEFLIN, Chief Justice.

The major holdings of this case are as follows:

1. The tests set forth in Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed. 2d 419 (1973) are engrafted by judicial construction to the 1961 Alabama obscenity statute.

2. With the Miller engraftments the 1961 Alabama obscenity statute is constitutional as applied in the context of the instant case.

3. Contemporary community standards referred to in *Miller* are statewide standards in Alabama.

This case is before this court on a Writ of Certiorari to the Court of Criminal Appeals. Petitioner Pierce was charged with violating Title 14, Section 374(4), Alabama Code of 1940, as amended (Recompiled 1958) (Supp.1971), in three separate indictments totaling 11 counts, all alleging that Pierce did "sell, exhibit, or commercially distribute non-mailable and obscene printed or written matter." The three cases were consolidated, and after a trial to a jury, Pierce was found guilty on all counts. Pierce appealed to the Court of Criminal Appeals which affirmed his conviction and denied rehearing, both without opinion. This court issued a Writ of Certiorari to the Court of Criminal Appeals to determine whether the statute under which Pierce was prosecuted meets the constitutional requirements of the First, Fifth and Fourteenth Amendments as enunciated in 1973 cases decided by the Supreme Court of the United States, and, to determine the precise effect of these recent developments on cases not finally decided at the time the decisions were handed down.

On three separate occasions, members of the Montgomery Police Department entered Jimmy's News Stand in Montgomery, Alabama, and purchased several items from petitioner Pierce at random. Officer Brown purchased "The Pussy Kissers," "My First Trick," "The Beautiful Yogi and the Stud," and "Italia"; Detective Wright purchased the "Filthy Funny Book" on one occasion and "The Young Suckers," "The Hardup Head Mistress," "Little Nudist Quarterly" and a newspaper-type publication identified as "Cruelty and Sex" on another occasion. All material purchased by both officers was in an area separated from the rest of the bookstore by a wire cage upon which a notice was posted stating, "Persons under 21 not admitted."

The defendant attempted to put into evidence a number of exhibits tending to show what community standards were extant in Montgomery, Alabama, but an

objection to the introduction of the exhibits was sustained. Defendant did call a witness who was allowed to testify as to community standards. The trial court charged that in determining whether the matter in evidence was obscene the jury was to consider the community standards of Montgomery, Alabama.

In view of the great volume of literature generated both by courts and legal commentators dealing with the "intractable obscenity problem," it hardly seems necessary for this court to add to the deluge by an extended discussion of the development of the current constitutional guidelines for treating such problems. The most authoritative analysis of what the United States Supreme Court has attempted to do over the years is found in that court's latest expressions (on June 21, 1973) on the subject and need not be repeated here. See Miller v. California, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973); Paris Adult Theatre I v. Slaton, 413 U.S. 49, 93 S.Ct. 2628, 37 L. Ed.2d 446 (1973); United States v. 12 200–Ft. Reels of Super 8 mm. Film, 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973); United States v. Orito, 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973); Kaplan v. California, 413 U.S. 115, 93 S. Ct. 2680, 37 L.Ed.2d 492 (1973).

The task before this court, therefore, is not to dwell on what has gone before, but to examine the issues presented by the case at hand, and in so doing to attempt to fashion some guidance for courts, prosecutors, defendants, juries and prospective defendants in this state which will conform with these most recently promulgated constitutional guidelines.

Title 14, Section 374(4), Alabama Code of 1940, as amended (Recompiled 1958) (Supp.1971), under which the petitioner was convicted, reads, in part, as follows:

"Every person who . . . sells, exhibits or commercially distributes, or gives away or offers to give away

. . . any obscene printed or written matter or material . . . shall be guilty of a misdemeanor . . . ."

For the purpose of Section 374(4) the word "obscene" is defined by Section 374(3):

" 'Obscene' means lewd, lascivious, filthy and pornographic and that to the average person, applying contemporary community standards, its dominant theme taken as a whole appeals to prurient interest."

In a 1971 per curiam decision this court affirmed a finding that the matter before the lower court was obscene in an equitable matter under Section 374(5). Section 347(5) is also dependent upon the Section 374(3) definition of obscenity. The court affirmed by finding that the definition embodied the then current constitutional tests:

"From viewing [the exhibits] we are persuaded that in them we find a coalescence of the following elements: (a) the dominate theme of the material taken as a whole appeals to the prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value." McKinney v. State, 287 Ala. 648, 254 So.2d 714 (1971), cert. denied, 405 U.S. 1075, 92 S.Ct. 1499, 31 L.Ed.2d 809 (1972). [Since there are a number of cases involving McKinney before this court, this case will be referred to as McKinney I.]

Thus, prior to June 21, 1973, in order to affirm a conviction for violating Section 374(4) the court would have to be satisfied that the above tests had been met. However, in Miller and its companion cases decided by the U.S. Supreme Court in 1973, new constitutional tests were established which were designed to eliminate the con-

fusion caused by the so-called *Roth-Memoirs* [1] tests described in *McKinney I*.

In *Miller,* the court attempted to provide "positive guidance" to other courts dealing with obscenity issues. The court recognized "the inherent dangers of undertaking to regulate any form of expression." Therefore, the court continued, "[s]tate statutes designed to regulate obscene materials must be carefully limited." The first limitation mentioned by the court was the scope of the statute: "[W]e now confine the permissible scope of such regulation to works which depict or describe sexual conduct." Furthermore, "[t]hat conduct must be specifically defined by the applicable state law, as written or [as] authoritatively construed." Other guidelines are succinctly stated in the following language:

"The basic guidelines for the trier of facts must be: (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest, . . . (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law, and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value."

The court went on to hold that "contemporary community standards" did not mean a national standard, and that a statute which referred to a state standard would be constitutionally permissible.

## APPLICATION OF MILLER

The first issue this court must deal with is whether the statute contains the necessary specificity as required by *Miller.* The

U.S. Supreme Court in *Miller* invites judicial construction as a method of supplying the required specificity if such is absent from the statute. As already mentioned, this court in *McKinney I* limited the reach of the statute by construing it as encompassing the then current *Roth-Memoirs* tests. The construction in *McKinney I* supplied all the elements of *Roth-Memoirs* tests even though these elements were missing from the statute as drafted. Similarly, this court now specifically incorporates the *Miller* guidelines or tests heretofore set out into its construction of the word "obscene" in Section 374(3). Thus the operation of the provisions of Section 374(4) applicable in this case is limited to matter which depicts or describes sexual conduct. The regulated matter is more specifically restricted to (a) "Patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated," or (b) "Patently offensive representation or descriptions of masturbation, excretory functions, and lewd exhibition of the genitals." Further, the state need only prove the work, taken as a whole, lacks serious literary, artistic, political or scientific value, rather than "utterly" without such value as was formerly the test.

■ The argument is made that *Miller* should not be retrospectively applied and that to construe the statute and apply it to the defendant in the instant case would violate ex post facto principles. This argument is without merit since the U.S. Supreme Court in a footnote to *Miller* states that "existing state statutes as construed *heretofore* or hereafter, may be adequate." (Emphasis added) *McKinney I* was decided prior to the defendant's arrest, indictment and conviction. *McKinney I* limits

---

1. See Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957) (obscenity not within the area of constitutionally protected speech or press); Memoirs v. Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966) ("the dominant theme of the material taken as a whole appeals to a prurient interest in sex; . . . the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and . . . the material is utterly without redeeming social value.")

the operation of Section 374(4) to at least lewd descriptions or pictures of female genitals. This Court, in holding the matter before it to be obscene in an independent review in *McKinney I,* describes the matter as follows:

"The front and back covers, however, were clearly visible through the cellophane covers and in one or more of these covers were the photographs of a female with her feet spread-eagled apart, exposing her genital organs.

"The appellant refers again and again in his briefs to the magazines as 'girlie' magazines. A more apt description would be 'genital' magazines."

Thus there is no doubt that from November 18, 1971, the date *McKinney I* was issued, all persons were on notice that magazines which contained lewd photographs or descriptions of female genitals were subject to Section 374(4).

In the case at hand, at least one exhibit covered in each indictment contains lewd photographs or descriptions of female genitals. There can be no doubt that as to such photographs or descriptions the *Miller* requirement for specificity had been supplied by *McKinney I* and that as applied to said matter, the potential vagueness of the statute had been cured by prior judicial construction.

The other ex post facto problem arises because *Miller* establishes a new social value norm. If the defendant would have been protected by the test of *Roth-Memoirs* but not by the *Miller* standards then arguments pertaining to ex post facto considerations could arise. The defendant here was found guilty under the old, but more stringent, "utterly" test, however, and an independent examination of evidence demonstrates that the jury's determination that the matter was utterly without redeeming social value was correct. If a defendant is protected by the restrictiveness of the "utterly" test then it is inescapable that he is

within the protective shield of the "serious" test for any publication which is utterly without value could have no serious value. Thus in this case there is no ex post facto problem applicable to the newly-created three-pronged test of *Miller*.

■ In adopting the new *Miller* standards this court wants to make clear that it is abandoning the *Roth-Memoirs* tests insofar as they conflict with *Miller*. Thus any portion of *McKinney I* and Visual Educators, Inc. v. Koeppel, 289 Ala. 410, 268 So. 2d 22 (1972) in conflict with *Miller* are expressly overruled. Coalescence of the three-pronged *Miller* test must now be demonstrated before a conviction may be had in an obscenity case.

It should be noted that this opinion does not address *all* the provisions of Section 374(4). Sections 374(1)–374(16) (the 1961 obscenity statute) purport to accomplish several ends: (1) To define obscene matter and prohibit the sale, etc., of such matter, (2) to provide the state an opportunity to get a civil determination of obscenity pertaining to a particular work or works, and to obtain an injunction pursuant thereto, and (3) to provide criminal procedures and sanctions for selling, etc., mailable matter which had been declared obscene in such civil action. The instant case does not involve (2) or (3) in any way and, therefore, should not be read as approving or disapproving these other facets of the statute. For a treatment of (3), see McKinney v. State, 292 Ala. 484, 296 So.2d 228 (1974) released simultaneously with this opinion.

As sections of 374(3) and 374(4) are applicable to the instant case this court holds that they are constitutional with the judicially engrafted *Miller* standards.

## SCOPE OF APPELLATE REVIEW

■ It is settled that an appellate court has the power to review determinations concerning the obscenity of matter

entered into evidence, but the scope of such power varies. The view already adopted by this court and here reaffirmed is that, on appeal, the appellate courts are to make an independent determination of obscenity, regardless of the finding in the trial court. See *McKinney I*, supra. See also Childs v. Oregon, 431 F.2d 272 (9th Cir. 1970); Blue Island v. DeVilbiss, 41 Ill.2d 135, 242 N.E.2d 761 (1969).

Since obscenity is a mixed question of constitutional law and fact, it is clear that such independent review provides greater assurance that no person will be subject to criminal punishment unless the matter in question really is obscene. Indeed in *Miller*, the Supreme Court, in rejecting the "utterly without redeeming social value" test, stated:

> "We do not adopt as a constitutional standard the *'utterly* [emphasis original] without redeeming social value' test of Memoirs v. Massachusetts, supra, 383 U.S. 413 at 419, 86 S.Ct. 975, at 977, 16 L.Ed.2d 1 (1966); that concept has never commanded the adherence of more than three Justices at one time. . . . If a state law that regulates obscene material is thus limited, as written or construed, the First Amendment values applicable to the States through the Fourteenth Amendment *are adequately protected by the ultimate power of appellate courts to conduct an independent review of constitutional claims when necessary.* See Kois v. Wisconsin, supra, 408 U.S. 229, at 232, 92 S.Ct. 2245, at 2247, [33 L.Ed.2d 312] (1972); Memoirs v. Massachusetts, supra, 383 U.S., at 459–460, 86 S.Ct., at 998 (1966) (Harlan, J., dissenting); Jacobellis v. Ohio, 378 U.S. 184, 204, 84 S.Ct. 1676, 1686, 12 L.Ed.2d 793 (1964) (Harlan, J., dissenting); New York Times Co. v. Sullivan, 376 U.S. 254, 284–285, 84 S.Ct. 710, 728, 11 L.Ed.2d 686 (1964); Roth v. United States, supra, 354 U.S. 476, at 497–498, 77 S.Ct. 1304, at 1315–1316 [, 1 L.Ed.

2d 1498] (1957) (Harlan, J., concurring and dissenting)." (Emphasis supplied)

## COMMUNITY STANDARDS

In the case at bar the trial court instructed the jury that "contemporary community standards" meant the community standards of Montgomery, Alabama. In *Miller*, the court upheld the use of state standards for determining contemporary community standards, and, therefore, there can be no question that the statewide community standards meet the *Miller* test. There is language, however, in *Miller* that intimates that even more localized standards may be acceptable.

 This court is of the opinion that the community standards should be statewide.

Other state courts have faced this issue and the results vary. Of the several state courts which have adopted statewide community standards only a few have bothered to furnish a reasoned analysis supporting their choice. In a pre-*Miller* case, the Supreme Court of Wisconsin adopted a state standard since a Wisconsin statute permitted a prior judicial determination of obscenity to be admitted as evidence of obscenity and to establish scienter in criminal prosecutions under certain conditions. That court felt for such an arrangement to be workable a state standard was demanded. See McCauley v. Tropic of Cancer, 20 Wis.2d 134, 121 N.W.2d 545 (1963). In another pre-*Miller* case, In re Giannini, 69 Cal.2d 563, 72 Cal.Rptr. 655, 446 P.2d 535, (1968), the Supreme Court of California adopted a state standard. After discussing the possibility of defining "community" to mean something less than the state as a whole the court stated:

> "Although these considerations [favoring 'local' community] are not de minimis, we conclude that on balance a community comprised of the entire State of California is the more appropriate. This

standard avoids administrative problems in determining the exact scope of a smaller community: whether it should be [a] city, county, individual neighborhood within a city, or whatever. Moreover, a strong policy favors uniformity in application of the state criminal law . . . ; we promote this policy by assuring that application of the obscenity law in this state will be based on a uniform 'community.' "

Both of the considerations mentioned by the Supreme Court of California have continued viability in a post-*Miller* environment.

Alabama would be faced with many problems in determining the exact scope of a community if it were smaller than the state as a whole. On first impulse, one would think that the county would be an appropriate geographical unit for establishing standards because one assumes a natural relationship between the county and the jury vicinage. However, this assumption is not always accurate, for in Alabama, there are a number of counties that have judicial divisions separating geographical areas in a county with separate courthouses for each such area. Prospective jurors that are assembled for trial selection in such counties come from within the bounds of such geographical divisions and can not be representative of the entire county. Such judicial geographical divisions (which are even applicable to the circuit courts) within such counties present problems pertaining to localized standards on a countywide basis.

Assuming for the sake of argument that standards will vary from county to county, then arguably, the standards may also vary from city to city. Moreover, taking the assumption one step further, there may be within a given city different standards, say, in residential neighborhoods as opposed to the areas surrounding a college campus and, perhaps, a trial court judge would have to deal with a number of standards. This myriad of possibilities for standards, coupled with the temporal requirement that standards be "contemporary" clearly demonstrates the burden which would be placed on the judicial system in trying to determine which standards are applicable at which location at which time.

Furthermore, if community is construed to be an area smaller than the state, then the problem arises as to whether standards must be proven by extrinsic or expert testimony, or whether the trier of facts (jury or trial judge) will make the determination without special proof of standards. If a jury is deemed to be the embodiment of the community, then proof of standards for the jury's sake would be superfluous. If a judge without a jury is allowed to make the determination under the same concept then there would be no need of proof of standards. But how would a reviewing appellate court be informed as to what standards were applied below? Under this alternative method an appellate court could make no independent determination of the issue of obscenity vel non. The results under such a system would cause many disparities in criminal convictions. While under our system of federalism it is fundamental and desirable for the national government to allow the states to develop their own standards, there is no underlying constitutional or policy basis mandating deference to "local communities," and to do so most certainly would lead to abuse of the criminal process.

Dean Pound, in his work on jurisprudence, discusses the desirable and undesirable aspects of justice without law by which he means "justice according to magisterial good sense [which] is more apt to accord with the moral sense of the community" as opposed to justice according to the rule of law. It is submitted that the use of standards of less than the state as a whole would approach this concept of magisterial

justice without law. Pound advises as follows:

"So far as the function of the legal order is merely to adjust controversies peaceably, administration of justice without law has its place. But this is no more than a small part of the function of the legal order. Such an administration of justice at best only partly maintains the social interest in the general security. The social interest in the security of transactions and the social interest in the security of acquisitions are but feebly maintained and may even be defeated. The individual interest of personality (an important aspect of the social interest in the individual life) is defeated if the limits of the rights which secure it are not set off by reasonably fixed precepts and maintained *by a uniform course of judicial action*. Under an Oriental regime [previously defined to mean one where a magistrate has total discretion] one must take many chances in believing that his ideas of justice will agree with those for the time being of the judge or magistrate when he passes on the matter. One cannot with safety do anything involving large expenditure of labor or money or extending over a long time. Oriental justice has gone along with a very low degree of economic development. With increasing complexity of affairs the bad effects of such lack of rule in the administration of justice are more acute. Civilization increases this complexity and so demands law in the sense of rule and order in the administration of justice, so that men may act assuredly to the future. *One essential in the administration of justice in a modern state is uniformity*. Experience has shown abundantly that this is attainable only by measuring relations and situations, as they become subjects of controversy, by reason.

". . . The idea, sometimes urged, that courts should administer what is called 'the will of the people' for the time being in each case is as out of place in a developed social and economic order as the corresponding sixteenth- and seventeenth-century doctrine that in every case they ought to administer the will of the King for the time being. If left to act freely in individual cases no will, either of King or of people, is sufficiently set and constant to insure an equal and uniform administration of justice. Judicial or magisterial caprice is incompatible with the social interest in the general security. Even in small causes it is the formal procedure which is to be dispensed with or made informal (without, however, dispensing with full and fair hearing of both sides) not the substantive law defining the rights of the parties." (Emphasis added) 2 R. Pound, Jurisprudence 369–71 (1959).

An interpretation of "community" which would permit the same act (i. e., selling a given book) to be criminal in one locality in the state and legal in another runs counter to the concept of the uniform administration of justice. Section 104(14) of the Alabama Constitution of 1901 indicates that the framers of our state constitution endeavored to develop a policy that criminal law should be uniformly applied since that section prohibits the legislature from passing a special, private or local act fixing the punishment of crime.

Furthermore, by adopting the new Judicial Article to the state constitution in December of 1973, the people of this state placed Alabama in the vanguard of a nationwide movement to secure uniformity in the administration of justice at the state level. A salient feature of this constitutional plan is a unified court system premised on the concept that in a modern, mobile society, the people have the right to receive uniform administration of justice throughout the entire state. This unified court system has been unanimously recommended by all of the organizations who have made recent in-depth studies in the field of judicial administration among the state court systems. Such system received

the stamp of approval of the National Conference of the Judiciary gathered at Williamsburg, Virginia in 1971 in its consensus statement.

Moreover, on the civil side, this court recently adopted the Alabama Rules of Civil Procedure, patterned after the federal rules, which also reflect the spirit of uniformity. There is even a specified rule which prohibits local rules unless they are approved by this court. See Rule 83, Alabama Rules of Civil Procedure.

After making such strides forward in requiring a high degree of uniformity in the administration of justice from an organizational and procedural standpoint, to permit the substantive law to become a chameleonic hodgepodge based on localized viewpoints would be a backward step.

While it is true that the jury in a criminal case is selected from a geographical area less than the state as a whole, there is no real reason to believe that there is any great difference in the morals of the average citizen of this state depending upon where he happens to live. That which appeals to the prurient interest and is patently offensive to the average rural dweller probably has the same impact on the average city dweller. This view is strengthened by considering the mobility of modern society, coupled with the impact of the mass media on contemporary thought. Citizens of this state often live in one locality and work elsewhere. Rural dwellers often work in towns or cities. Persons living in towns and cities often have strong ties with those who live in rural areas, either by family relationship or through friendship. Citizens of this state travel from one end of the state to another almost on a daily basis. In addition, our citizens are exposed to the same news coverage, either in newspapers or through electronic media, and people in all sections of the state are exposed to the same televised entertainment. All of these factors contribute to a degree of homogeneity in the average citizens of our state which would tend to neutralize any variance in standards based on a locality. Alabama may have more such homogeneity than most states.

This is not to deny that there may be persons or groups of persons whose views of "prurient interest" and "patently offensive" differ widely. Admittedly, some may take an 'anything goes' attitude while others would condemn even a bare feminine ankle. But it is the standard of the *average* citizen of this state that the trier of facts is to apply.

In short, it is the opinion of this court that statewise standards are not only desirable, but are also feasible. Therefore it was error for the trial court to charge the jury that the standard to be applied was that of Montgomery, Alabama. See also State v. J-R Distributors, Inc., 82 Wash.2d 584, 512 P.2d 1049 (1973); (statewide standards approved).

■ The question arises, however, as to whether this was reversible error. At least one publication involved in each indictment is hard core pornography. Following the precedent of *McKinney I*, this court, based on the evidence in this case, finds such publications as being offensive to the contemporary community standards of Alabama and the Nation, as well as of the City of Montgomery. Therefore, the instruction of the trial court was error without injury *in this case*. Supreme Court Rule 45.

## ADMISSIBILITY OF OTHER MATERIALS

■ The last issue raised by the instant case is whether the trial court erred in ruling that other books purchased in Montgomery, Alabama, could not be admitted as evidence of community standards. There is a split of authority on this issue, some courts holding that such matter is admissible and others holding that it is inadmissible. See generally, Annotation, 5 A.L.R.3d 1158 (1965). One view is that such evi-

dence is irrelevant to the issue of whether the matter before the court is obscene, since the fact that other publications are in bookstores and on news stands is no indication that they are sold and widely read. This defect can be cured, however, by establishing a proper foundation prior to the introduction of the matter.

In United States v. Manarite, 448 F.2d 583 (2d Cir. 1971) the Second Circuit Court of Appeals addressed this problem:

> "Evidence of mere availability of similar materials is not by itself sufficiently probative of community standards to be admissible *in the absence of proof that the material enjoys a reasonable degree of community acceptance.* Womack v. United States, 111 U.S.App.D.C. 8, 294 F.2d 204, 206 (1961), cert. denied, 365 U.S. 859, 81 S.Ct. 826, 5 L.Ed.2d 822 (1961). Such proof would normally be supplied by expert witnesses. No such proof was offered. In the absence of this foundation, the allegedly similar pornographic material was properly excluded. Mere availability of similar material by itself means nothing more than that other persons are engaged in similar activities." (Emphasis added).

The underlying rationale of this position has been stated by the late Mr. Justice Harlan:

> "[T]he trier of an obscenity case must take into account 'contemporary community standards,' Roth v. United States, 354 U.S. 476, 489, 77 S.Ct. 1304, 1 L.Ed. 2d 1498 . . . . The community cannot, where liberty of speech and press are at issue, condemn that which it generally tolerates." Smith v. California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959) (Harlan, J., concurring in part and dissenting in part).

See also Yudkin v. State, 229 Md. 223, 182 A.2d 798 (1962) (Trier of fact has the "right to read, or be informed of, the contents of comparable books that have been generally accepted or tolerated by the public.")

■ Therefore, once the proper predicate has been laid by demonstrating to the trial court's satisfaction that the matter offered as evidence of contemporary standards enjoys a reasonable degree of acceptance or tolerance (either by way of expert testimony, volume of sales, or other means) the matter should be admitted.

■ This is not to hold, however, that every *book* or photograph proffered must be admitted. The admission of a large number of different items alleged to be comparable to the matter in question might make the trial unmanageably complex and lengthy and would amount to no more than cumulative evidence. Therefore, while the trial court must admit evidence of community standards after a proper predicate has been established, the volume of such evidence must be left to the sound discretion of the trial court, and this court will not review the trial court's decision on this issue except for an abuse of discretion. See, Chambers v. Culver, 289 Ala. 724, 272 So. 2d 236 (1973); Freeman v. Hall, 286 Ala. 161, 238 So.2d 330 (1970); Stokes v. Bryan, 42 Ala.App. 120, 154 So.2d 754 (1963).

Affirmed.

MERRILL, HARWOOD, BLOODWORTH, MADDOX, McCALL and FAULKNER, JJ., concur.

COLEMAN, J., concurs in result.

JONES, J., dissents.

JONES, Justice (dissenting).

My views have been expressed in McKinney v. City of Birmingham, 292 Ala. 484, 296 So.2d 236 (1974), released simultaneously with this opinion, and I respectfully dissent on the same grounds.