313 So.2d 547

**Gerald MATHENY, alias**

v.

**STATE.**

**3 Div. 295.**

Court of Criminal Appeals of Alabama.

Feb. 18, 1975.

Rehearing Denied April 1, 1975.

J. Paul Lowery, Montgomery, for appellant.

William J. Baxley, Atty. Gen., and Kermit M. Downs, Asst. Atty. Gen., for the State.

**DeCARLO, Judge.**

Selling obscene matter; six months hard labor and $500. fine.

On July 12, 1973, K. W. Jones, an investigator for the District Attorney's office, went to Jimmy's News Stand in Montgomery, Alabama, and purchased from Gerald Matheny, three publications; "Krazy Kittens Number 5", "Gay Blades" and "Depravity Post". Appellant was charged in the county court with violation of T. 14, § 374(4), Cumulative Pocket Part, Code of Alabama, 1940, and in November, 1973, an indictment was returned by the Grand Jury of Montgomery County. The indictment contained three separate counts charging appellant with selling, exhibiting or commercially distributing non-mailable and obscene printed or written matter or material to K. W. Jones. Each count was the same except for charging appellant with the above offense as to each of the different publications.

Among the grounds asserted by appellant on demurrer to the indictment were (1) the state's failure to show under which statute it was proceeding and (2) that the accusation charging appellant with commercially distributing "non-mailable" and obscene printed or written material or matter was vague and misleading. The demurrer was overruled and a motion to suppress denied. Subsequently, a jury found appellant guilty on all counts.

**I**

Appellant asserts he has been denied equal protection of the law under the Constitutions of the United States and the State of Alabama. Counsel argues each of the statutory enactments pertaining to obscenity, T. 14, § 374(1), (16), September 8, 1961, (under which this prosecution was based) and T. 14, § 374(16j–16o), both acts being found in Cumulative Pocket Parts, Code of Alabama, 1940, have different definitions of the same offense and contain different punishment. He insists this double standard precludes the trial court from clearly instructing the jury.

The thrust of this argument is that the interpretation of "obscenity" is so indefinite and uncertain, an offense cannot readily or clearly be defined.

■ This contention fails under Pierce v. State, 292 Ala. 473, 296 So.2d 218, wherein the Alabama Supreme Court incorporated the "Miller" tests into its construction of the word "obscene".

*Pierce,* supra, provides reasonable standards of guilt, which were adopted from these *Miller* guidelines:

". . . we now confine the permissible scope of such regulation to works which depict or describe sexual conduct. That conduct must be specifically defined by the applicable state law, as written or authoritatively construed. A state offense must also be limited to

works which, taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not have serious literary, artistic, political, or scientific value.

"The basic guidelines for the trier of fact must be: (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest, Kois v. Wisconsin, supra, 408 U.S. 229, at 230, 92 S.Ct. 2245 at 2246, 33 L.Ed.2d 312 (1972), quoting Roth v. United States, *supra,* 354 U.S. 476 at 489, 77 S.Ct. 1304, at 1311, 1 L.Ed.2d 1498 (1957), (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value . . ."

Miller v. California, 413 15, 93 S.Ct. 2607, 37 L.Ed.2d 419.

Although the Alabama obscenity statutes may not portray the precision necessary to weather all criticism, they do not offend due process requirements. These statutes are cumulative and set forth the offense intended to be punished.

". . .' * * * [T]he Constitution does not require impossible standards'; all that is required is that the language 'conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices * * *.' United States v. Petrillo, 332 U.S. 1, 7–8, 67 S.Ct. 1538, 1542, 91 L.Ed. 1877. These words, applied according to the proper standard for judging obscenity, already discussed, give adequate warning of the conduct proscribed and mark ' * * * boundaries sufficiently distinct for judges and juries fairly to administer the law * * *. That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls

is no sufficient reason to hold the language too ambiguous to define a criminal offense * * *' . . ."

Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498.

Under the *Miller* standards, as engrafted by *Pierce,* supra, we believe adequate warning of indictable conduct is present and affords judges and juries a distinct purview in which to administer the law.

Next, the appellant's complaint concerning the difference in punishments is unsupported. A careful reading of both statutes indicates the range of punishment is the same for *selling.*

## II

Appellant contends the court erred in not permitting introduction of alleged comparable material available in the community, and testimony relating to so-called "x-rated" movies shown in the vicinity.

The availability of similar materials in a community does not automatically make them admissible as tending to prove the non obscenity of the publications the appellant is charged with selling.

". . . the mere fact that materials similar to the brochure at issue here 'are for sale and purchased at book stores around the country does not make them witnesses of virtue.' 481 F.2d at 320. Or, as put by the Court of Appeals in United States v. Manarite, 448 F.2d 583 (CA2 1971):

". . . 'Mere availability of similar material by itself means nothing more than that other persons are engaged in similar activities."

Hamling v. United States, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590.

The rejection of this evidence was proper. McKinney v. Birmingham, 52 Ala.App. 605, 296 So.2d 235, cert. den., 292 Ala. 726, 296 So.2d 202, and authorities cited therein.

It is insisted that the introduction of the alleged obscene publications without expert testimony of a community standard was a denial of due process.

The Supreme Court of the United States in *Hamling,* supra, emphasized that jurors had the ability, without the benefit of expert testimony, to ascertain the sense of the "average person" in applying community standards.

■ In the case at bar, the jurors were entitled to draw on their own knowledge in determining the view of the average person of their community concerning what was considered obscene. *Hamling,* supra.

■ The materials were sufficient in themselves for resolving the issue. Kaplan v. California, 413 U.S. 115, 93 S.Ct. 2680, 37 L.Ed.2d 492.

### IV

Finally appellant argues that the trial court was in error when it allowed the State to cross-examine a witness called on as an expert in this manner:

"Q. (By Mr. Thomas) Have you found that it is the community standard in Montgomery, Alabama, that it is accepted in Montgomery, Alabama, that these books be sold—not that the books—You testified that a book just like this is sold at a Pak A Sak. (Referring to State's Exhibit No. 3.)

"A. Well,——

"Q. I want to see the book. But you testified that it is sold at the Pak A Sak. Is it your testimony that it is accepted as a community standard in Montgomery, Alabama that these type pictures, such as this (Indicating.), be sold in Montgomery, Alabama?

"A. *I would say that the fact that they are sold and the people buy them is prima facie evidence that they are accepted within the community.* (Emphasis added)

"Q. Why would you say that?

"A. Well, I think it's fairly obvious that if they are sold and people buy them, then somebody is buying them within the community.

"Q. Well, do you know whether or not marijuana is sold within this community?

"MR. LOWERY: Your Honor, we object to any marijuana; that's a prejudicial against——

"MR. THOMAS: This cross examination, and I want to know what this witness is [sic] statement is all about; what is his opinion based on?

"Q. (By Mr. Thomas) Do you know whether or not marijuana is sold in Montgomery, Alabama?

"MR. LOWERY: We object, that's not
——

"MR. THOMAS: This is a comparison and an analogous situation, Judge; both of them are against the law.

"MR. LOWERY: If we're going to go into marijuana, Judge, we'll have to get an indictment.

"THE COURT: Gentlemen, you all are going to get me in a verdict direct, because I'm going to make some observations here directly.

"MR. LOWERY: We object, your Honor.

"THE COURT: I'm going to sustain the objection.

"Q. (By Mr. Thomas) All right. I'll ask you another question. Do you know —would you consider the fact that because marijuana is sold in Montgomery, Alabama that it is accepted as a community standard for marijuana to be sold?

"MR. LOWERY: Objection.

"THE COURT: No. I don't think that question was covered, Mr. Thomas, as a community standard.

"MR. THOMAS: Well, he stated that because a book is sold in a book store, Your Honor, that therefore ergo, it would be accepted by the community.

"THE COURT: Well, the marijuana proposition wouldn't be accepted as a standard, except as a medication or a drug.

"MR. THOMAS: I understand.

"THE COURT: Well, rephrase your question.

"MR. THOMAS: Now, what did you say, excuse, Judge. I'm asking you how to ask it so I can get it in. I want to know whether or not he thinks it is a community standard.

"THE COURT: *The fact that marijuana is sold and used in Montgomery, is that accepted as a community standard as a medication or as a medicine?* (Emphasis added)

"MR. LOWERY: Note our objection to the court's question.

"THE COURT: Well, the court is going to overruled [sic] your objection to that. (Laughter.) Now, go ahead and answer it, please sir.

"THE WITNESS: Judge, would you repeat that question? (Laughter.)

"THE COURT: Read it back to him, Mr. Reporter. (Whereupon, the reporter read the question back to the witness.)

"THE COURT: You understand that question?

"THE WITNESS: This question presumes that I have knowledge that marijuana is sold in Montgomery. I have no personal knowledge that marijuana is.

"THE COURT: No, it doesn't presume that either.

"THE WITNESS: Well, the fact that it is sold, if that is a fact——

"THE COURT: Well, you read it—I don't have knowledge of it—but you read

it in the paper where they try these marijuana cases.

"THE WITNESS: I do know from what I read in the papers.

"THE COURT: All right. Go ahead and answer the question, if you can.

"THE WITNESS: *It is a medication, I would say, no. As I understand the question, I would say no.* (Emphasis added)

"THE COURT: That answers it.

"MR. LOWERY: We move to exclude that answer.

"THE COURT: Overruled.

"MR. LOWERY: We move for a mistrial.

"THE COURT: Overruled.

"MR. LOWERY: All right, your Honor, we except."

Counsel argues that this testimony of unrelated conduct by way of hypothesis was irrelevant to the offense charged. It is his contention that selling marihuana is a separate criminal offense, and this testimony implied the sale of the publications in evidence was no more justified than a sale of marihuana.

 In George v. State, 240 Ala. 632, 200 So. 602, Justice Livingston wrote:

"Expert witnesses may be cross-examined and their opinion obtained based on other states of facts assumed by the party examining them to have been proved upon a hypothetical case; and they may be cross-examined on purely imaginary and abstract questions. Such questions are not only permissible in order to get the opinion of the expert witness upon all possible theories of the case, *but they are allowable to test the value and accuracy of the opinion of the witness himself."* (Emphasis added).

■ It is our judgment that the question under review was an attempt to test the value and accuracy of the witness's opinion in how he arrived at a community standard. Further, in view of the witness's negative answer, the appellant suffered no prejudice. The court's ruling was proper.

We have examined the publications presented in the case and find them obscene. Our review of the record and the material seems to require this comment. Anyone reading Chaucer's "Canterbury Tales" for the first time would be unable to comprehend its meaning without some extrinsic knowledge or aid. It is our observation, however, that a person reading or reviewing the printed matter in this case needs nothing more to insure his comprehension than the ability to see and read.

Affirmed.

All the Judges concur.