**UNITED STATES of America,**
**Appellee,**

v.

**Samuel F. MANARITE et al., Defendants-Appellants.**

**Nos. 810–814, Dockets 35606, 71–1014, 71–1045–71–1047.**

United States Court of Appeals, Second Circuit.

Argued May 6, 1971.

Decided July 7, 1971.

Certiorari Denied Nov. 9, 1971. See 92 S.Ct. 281, 285, 287, 298.

Robert E. Lindsay, U. S. Dept. of Justice, Washington, D. C. (Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., New York City, of counsel), for United States of America.

William S. Ellis, New York City, for defendant-appellant Samuel Manarite.

James M. La Rossa, New York City (Gerald L. Shargel, New York City, of counsel), for defendant-appellant Richard Portela.

Patrick M. Wall, New York City, for defendant-appellant Luis Marti.

Herald Price Fahringer, Jr., Buffalo, N. Y. (Lipsitz, Green, Fahringer, Roll, Schuller & James, Buffalo, N. Y., and Robert Milavetz, Minneapolis, Minn., of counsel), for defendant-appellant Ferris Jacob Alexander.

Michael P. Direnzo, New York City, for defendant-appellant Dominick Constantino.

Before LUMBARD, SMITH and KAUFMAN, Circuit Judges.

LUMBARD, Circuit Judge:

Samuel F. Manarite, Richard Portela, Luis Marti, Ferris Alexander and Dominick Constantino appeal from judgments of conviction following a 15-day trial in the Southern District of New York before Hon. Lloyd F. MacMahon, which resulted in jury verdicts against them on October 28, 1970. The appellants were all convicted of conspiracy under 18 U.S.C. § 371 to violate 18 U.S.C. § 1465 (transportation in interstate commerce of obscene material for purpose of sale or distribution) and on other counts of the 13 count indictment which charged substantive violations of section 1465.[1] Manarite was sentenced to eighteen months in prison, and fined $5,000; Portela was sentenced to three years in prison and fined $30,000; Marti to two years in prison and fined $15,000; Constantino received a year and a day and a $5,000 fine, while Alexander was sent to prison for eighteen months and fined $20,000.[2]

---

1. 18 U.S.C. § 1465 provides in part:
 "Whoever knowingly transports in interstate * * * commerce for the purpose of sale or distribution any obscene * * book * * * or any other matter of indecent or immoral character, shall be fined not more than $5000 or imprisoned not more than five years, or both.
 "The transportation as aforesaid of two or more copies of any publication [or article] * * * of the character described above, or a combined total of five such publications and articles, shall create a presumption that such publications or articles are intended for sale or distribution, but such presumption shall be rebuttable. * * *"

2. Alexander and Portela were convicted on Counts Seven and Ten (relating to transportation between New York and Minneapolis of 10,000 copies of "Adam and

The appellants assert numerous claims of error which we treat as follows:

I. The Sufficiency of the Evidence

II. Alleged Errors Involving Admission of Evidence Relating to Extrajudicial Statements of Co-Conspirators

III. Alleged Errors Relating to the Determination as to the Pornographic Nature of the Material

IV. Evidence Seized Incident to Portela's Arrest

V. Use of Hearsay Evidence Before the Grand Jury

VI. Constitutionality of § 1465

As we find that there was more than ample evidence to support the convictions, and no reversible error in the conduct of the trial, we affirm the convictions.

## I.

### THE SUFFICIENCY OF THE EVIDENCE

During the three week trial, the government advanced abundant evidence from which the jury could find that the appellants were guilty of the conspiracy, as charged, to produce hard core pornography in New York and distribute it to various cities, including Richmond, Philadelphia, Minneapolis, Cleveland, Washington, D. C., Chicago and Baltimore, and of the substantive offenses of which they were convicted. The evidence, which included testimony by four witnesses who were active participants, may be summarized as follows: Films were produced in Manhattan by Marti, who owned a shop known as the "Camera Eye" located at 12 West 21st Street, and the maga-

zines and other printed matter were produced by Phil Frimet, the owner of "Anchor Litho" printing shop on 12th Street, in Manhattan, with the exception of one magazine which Frimet arranged for a sub-contractor to print. Frimet testified fully as to the nature of his activities. Portela distributed the material thus produced and employed various persons to assist him in this operation. Bruce Valentine and Frank Del Rosso testified at length as to trips which they made alone or with other co-conspirators for the purpose of selling and delivering the material in question for Portela and Marti. Manarite was the financier of the group. Alexander was a Minneapolis dealer who purchased material from Portela and Marti, and caused it to be transported in interstate commerce for commercial distribution.

The events recounted at the trial began in September or October, 1968, with the purchase by Frimet of "Anchor Litho." Initially, Frimet produced obscene playing cards which were purchased by Portela and defendant Paul Wolf.[3] Constantino picked up these cards from Frimet on behalf of Portela and Wolf. In December, 1968, Portela engaged Bruce Valentine to assist him in distributing the material which he was ordering from Frimet and Marti. Portela and Valentine went to Philadelphia and Baltimore for the purpose of selling "Action," an obscene magazine printed by Frimet. Soon thereafter, Portela and Valentine went to Cleveland to sell certain hard core films which Constantino had transported to that city. During this trip, Portela told Valentine that Marti was the only producer of hard core films in Manhattan. Then, in Feb-

Eve" and "Kiss it Hard" magazines, respectively). Portela was also convicted on Count Twelve (relating to transportation of 1,000 copies of "Color Climax" magazine from New York to Baltimore) and, along with Marti, on Count Thirteen (transportation of certain films from New York to Baltimore). Three defendants were acquitted in all respects: Salvatore Puntasecca, Max Bornstein and Carol Portela, wife of

appellant Richard Portela. References to "Portela" unless otherwise indicated are to Richard Portela.

3. Prior to trial upon the government's motion, the case was severed as to six defendants, and of these Phil Frimet and Frank Del Rosso pleaded guilty to the conspiracy count and testified as government witnesses.

ruary, Valentine and Constantino only, made a third trip to Baltimore and Philadelphia, for the purpose of selling films, playing cards and books. Valentine described the material as consisting of depictions of men and women engaged in sexual activities, apparently similar to the mass of materials admitted into evidence.

■ In January, 1969, Ferris Alexander,[4] came to New York from Minneapolis and ordered some hard core materials from Portela, and Portela told Alexander that he would send him these materials. In February, Valentine and Carol Portela drove to Minneapolis with a U–Haul trailer and delivered 10,000 copies of "Adam and Eve" magazine, another Frimet production. Valentine picked up the material in Manhattan at the Casco Bindery, an establishment owned by one Herb Goldwasser, assisted by Constantino, Frimet, Bornstein, Portela and Wolf. Subsequently, in March, 1969, Valentine delivered an additional 10,000 copies of "Adam and Eve" to Alexander and in April 10,000 copies of "Kiss it Hard," still another product of the Frimet establishment, were delivered, part of a run of 30,000 copies of that title printed in April.[5] On the last occasion Alexander gave Valentine about one thousand films with which he was dissatisfied and asked that they be returned to Portela for credit. When Valentine gave these films to Portela, Portela said that the films came from Marti and not from him. The next day, Portela told Valentine that he was flying to Minneapolis with Bob Shuttlesworth, Marti's bookkeeper, to settle the matter.

Additional copies of various issues of "Kiss it Hard" were sold by Frimet and Constantino during a sales trip to Baltimore. "Kiss it Hard" unlike other magazines printed by Frimet, was produced on a partnership basis with Portela. In other cases, Portela and Wolf paid Frimet in cash.

In April, 1969, Del Rosso was engaged by Portela to assist in delivering pornographic materials. Del Rosso testified that, in persuading him to do this work, Portela told Del Rosso that Lou Marti was Portela's supplier of films. That same month, Del Rosso and one Owen Osterman rented a U–Haul and a truck for a sales trip to Baltimore, Washington, D. C., Philadelphia and Virginia. Among the items sold on this trip was "Adam and Eve." Del Rosso went to "Camera Eye" where Marti gave him additional books and magazines for the trip which he was about to undertake. In any event, Portela told Del Rosso that all sales made on his trip should be made on a cash basis if possible, and otherwise checks were to be made out to Lou Marti's "Camera Eye." Subsequently, Del Rosso made a sales trip to Minneapolis.

At about this time, Valentine spoke to Marti about purchasing films from him which he said he would try to sell in Baltimore. Marti refused to sell films to Valentine for this purpose on the ground that he sold his films in Baltimore through Portela. However, Marti agreed to let Valentine purchase films for resale in Chicago, and supplied Valentine with a list of possible sales prospects in that city.

4. Unless otherwise indicated "Alexander" refers to the appellant Ferris Alexander. His brother, Edward Alexander, was named as a co-defendant but his trial was severed from that of the appellants.

5. On the basis of this evidence, the jury could have concluded that Alexander ordered the material (or at least encouraged Portela to bring it to him on approval) before the material was in fact brought into the state and thus the evidence was clearly sufficient as to the convictions of Alexander (as well as Portela) on Counts Seven and Ten relating to the March and April trips to Minneapolis respectively. We have no occasion to consider the application of § 1465 to cases where a person has no connection with those transporting material in interstate commerce until after the material was brought into the state. Cf. Rewis v. United States, 401 U.S. 808, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971).

In late May, James Kelly,[6] who had just opened a book store in Baltimore, came to New York and purchased from Portela obscene playing cards, "Kiss it Hard" and "Tiny Tim," another magazine produced for Portela and Wolf by Frimet. A few days later Portela delivered some color film to Kelly in Baltimore. Shortly thereafter about 1,000 copies of "Color Climax" were sold to Kelly by Portela and they were delivered to Kelly by Manarite who fixed the price to be paid.

On June 25, the Baltimore police raided Kelly's shop and seized various obscene articles pursuant to a warrant. Copies of "Color Climax," "Kiss it Hard" and "Tiny Tim" were among the publications seized in this June 25 raid. Thereafter, Portela contacted Kelly by telephone and asked him if he wanted any new films. Kelly replied in the affirmative and then contacted the F.B.I. Portela registered in the Baltimore Holiday Inn under the alias "Nick Devito" where Kelly came to meet him on July 12. After two boxes of obscene films were transferred to Kelly's car, the Baltimore police arrested both Portela and Kelly, along with several others, and seized the films. Portela told Kelly over coffee after they had been released on bail, that Lou Marti supplied most of the films which had been the cause of their arrest, while a few films had come from one Lou Saks.

On July 23, Carol and Richard Portela were arrested in their apartment in Rego Park, New York, pursuant to a warrant issued by a United States Commissioner, on complaint of an F.B.I. agent. Hard core pornographic materials were seized, along with a tear gas gun, a .32 caliber gun and various other items. Thereafter the appellants were indicted on October 27, 1969.

The magazines, playing cards, and films distributed by the conspirators were introduced in evidence. These materials graphically depict nude (or virtually nude) men and women, men and men, and women and women engaged in various sexual acts, including sexual intercourse, fellatio, cunnilingus, sodomy and the like in numerous permutations and combinations. No attempt was made, or could be made, to suggest that any of this material constitutes instructional material on sexual technique, that it documents sex habits or that it has any social value. The evidence shows that the appellants themselves referred to this material as "hard core pornography," which is all that it is.[7]

There was ample evidence to support the conviction of each of the appellants of each of the counts of which they were convicted.

■ Alexander argues that even if on two isolated occasions he may have committed substantive violations of § 1465, there is no proof that he was involved in a conspiracy to violate that section, or at least he was not proved to be part of the conspiracy charged. We do not agree. The conspiracy here shown was of the type sometimes referred to as a "wheel conspiracy" in that members of a "core" group deal with a number of contacts who are analogized to the spokes of a wheel and are connected with each other only through the core conspirators. In such conspiracies, whether the spoke participants may be found to be members along with the core conspirators depends on whether or not the "spokes" knew or had reason to know of the existence, but not necessarily the identity, of one or more of the other spoke participants in the wheel conspiracy. Compare United States v. Kotteakos, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) with Blumenthal v. United States, 332 U.S. 539, 559, 68 S.

---

6. Kelly was indicted as a co-conspirator. His trial was severed and he testified for the government.

7. See Mr. Justice Stewart's definition of the term "hard core pornography" in his opinion in Ginzberg v. United States, 383 U.S. 463, 499 n. 3, 86 S.Ct. 942, 16 L.Ed. 2d 31 (1966).

Ct. 248, 92 L.Ed. 154 (1947).[8] See also United States v. Andolschek, 142 F.2d 503, 507 (2d Cir. 1944).

On this record it is obvious that Alexander must have known that this material which was delivered to him in quantities of 10,000 copies at a time was also being distributed to other dealers. He visited Portela in New York and must have been aware of the nature and extent of the conspiracy and its operation. See United States v. Aiken, 373 F.2d 294 (2d Cir. 1967), cert. denied, 389 U.S. 833, 88 S.Ct. 32, 19 L.Ed.2d 93 (1967).

## II.

ALLEGED ERRORS INVOLVING ADMISSION OF EVIDENCE RELATING TO EXTRAJUDICIAL STATEMENTS OF CO-CONSPIRATORS

Lou Marti argues that many of the statements admitted under the co-conspirator exception to the hearsay rule were improperly admitted. The testimony challenged includes the following:

(1) Valentine's testimony that Portela told Valentine that Marti had been the seller of certain films which were returned by Alexander to Portela via Valentine.

(2) Valentine's testimony that Portela told Valentine when they drove to "Camera Eye" that Portela was going to go into the shop to order films from Lou Marti.

(3) Agent McShane's testimony that Portela had an argument with Wolf during which Portela said that they should "let Lou Marti settle this."

(4) Del Rosso's testimony that Portela told Del Rosso that Portela obtained films from Marti.

(5) Valentine's testimony relating to his conversation with Marti wherein Valentine sought to purchase films for sale in Baltimore, was rebuffed on the grounds that Portela sold Marti's films in Baltimore, but then was sold films for resale in Chicago and given a list of possible customers.

(6) Kelly's testimony that after he and Portela were arrested, Portela told Kelly that Portela obtained films from "Poncho" [Marti].

(7) Valentine's testimony that Portela told Valentine that Marti was the only producer of hard core films in Manhattan.

Also challenged as not within the scope of the conspiracy is Valentine's testimony that Portela told him that Manarite was financing the operation. Appellant contends that the above statements should have been excluded as either not in furtherance or not in the course of the conspiracy charged. We do not agree.

■ Statements of co-conspirators made in furtherance and in the course of a conspiracy are admissible as each of the conspirators is an agent of the other conspirators, and, therefore, such statements are evidence against all those involved in the conspiracy. See Lutwak v. United States, 344 U.S. 604, 617–618, 73 S.Ct. 481, 97 L.Ed. 593 (1953); Logan v. United States, 144 U.S. 263, 12 S.Ct. 617, 36 L.Ed. 429 (1892); United States v. Birnbaum, 337 F.2d 490, 495 (2d Cir. 1964).[9]

---

8. In *Kotteakos,* the convictions of persons accused of conspiracy to violate the National Housing Act were reversed because the only connection between the various persons involved was that each had made fraudulent applications to the same broker. However, in *Blumenthal,* the Supreme Court affirmed the convictions of salesmen involved in the illegal sale of liquor on the theory that each was "aiding in a larger plan."

9. This rule is codified in the proposed Federal Rules of Evidence, Rule 801(d) (2) (v). Proposed Rule 801(d) provides in part:

"(d) Statements Which Are Not Hearsay. A statement is not hearsay if:

\* \* \* \* \*

(2) *Admission by Party-Opponent.* The statement is offered against a party

■ The first challenged statement seems clearly to have been within the scope of the conspiracy. Alexander was seeking refunds from Portela on certain films for which Portela felt he was not responsible. It was necessary to clarify responsibility for these films in order to maintain Alexander's continued cooperation, and to do this Portela and Marti's bookkeeper promptly flew to Minneapolis. In order to avoid recurrence, Portela wanted Valentine to understand that he should not accept such returns. See United States v. Annunziato, 293 F. 2d 373, 380 (2d Cir. 1961), cert. denied, 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134 (1961).

■ Similarly, the second challenged statement, relating to Portela's intent to buy films from Marti, made as Portela was about to go to the "Camera Eye," could be interpreted to be an attempt by Portela to acquaint Valentine with the practice of the conspirators so that Valentine would conform thereto.

■ The third statement, Portela's suggestion to Wolf that they let Lou Marti settle their dispute, is clearly in furtherance of the conspiracy because it was an attempt to find a means to insure its continuance, in the face of a serious disagreement between two of the key figures.

■ Number four, Portela's statement to Del Rosso that Lou Marti supplied the films could be considered as an inducement for Del Rosso to enter the conspiracy.

■ As to number five, Marti's statement that Valentine couldn't sell in Baltimore because that was Portela's territory obviously was in furtherance of the main conspiracy and was admissible on that basis regardless of whether Marti and Valentine had entered into any separate conspiracy. The fact that Marti agreed to allow Valentine to sell his films in Chicago and to furnish a list of possible customers in that city (in addition to suggesting that Marti had a stake in Valentine's venture), is not itself hearsay, since offered to prove the fact of agreement rather than the truth of any assertion relating to past or future agreement. Similarly, the testimony regarding possible purchasers in Chicago was clearly in furtherance of the conspiracy.

■ The sixth item, relating to Portela's statement that Marti was the only producer of hard core films in Manhattan, may well have been made in order to emphasize to Valentine the importance of Marti to the operation. Valentine, who previously had held Marti up at gun point, had not in the past shown proper deference to someone so important to the functioning of the conspiracy, and the jury might infer that Portela wished to avoid any repetition of this sort of conduct insofar as Marti was concerned.

■ Portela's identification of Marti as the supplier of the films seized in the July 12 shipment to Baltimore was made to Kelly after they both had been arrested and then released from custody. However, their arrest did not necessarily terminate the conspiracy. United States v. Agueci, 310 F.2d 817, 838–839 (2 Cir. 1962), cert. denied, 372 U.S. 959, 83 S. Ct. 1016, 10 L.Ed.2d 12 (1963). Portela told Kelly in that same conversation that he intended to continue in the pornography business. In this context, his mention of Marti may well have been to persuade Kelly to continue to deal with the conspirators, despite their arrests.

■ As to Portela's remark to Valentine that Manarite was financing the operation, this could have been for the purpose of suggesting to Valentine the need to show deference to certain figures in the conspiracy, in this case to Manarite, whom he was about to meet.

We find no error in the admission of this evidence.

and is * * * (v) a statement by a coconspirator of a party during the

course and in furtherance of the conspiracy."

## III.

### ALLEGED ERRORS RELATING TO THE DETERMINATION OF THE COURT AND JURY AS TO THE PORNOGRAPHIC NATURE OF THE MATERIAL

■ The claims of the appellants relating to alleged errors in the Court's charge on obscenity, and the admissibility of certain evidence sought to be introduced on the issue of contemporary community standards, have an unreal quality in the light of the nature of the material described, and in the light of the use of the term "hard core" by the conspirators themselves in describing the material. In any event, the contentions of the appellants in this respect are entirely without merit.

*Charge on the Elements of Obscenity*

■ The Court, in charging the jury on the elements of obscenity, properly stated the applicable law. See United States v. Roth, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957); A Book Named "John Cleland's Memoirs of a Woman of Pleasure" v. Attorney General of Massachusetts, 383 U.S. 413, 86 S.Ct. 975, 16 L.Ed.2d 1 (1966); Redrup v. State of New York, 386 U.S. 767, 87 S.Ct. 1414, 18 L.Ed.2d 515 (1967); Jacobellis v. Ohio, 378 U.S. 184, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964); Mishkin v. New York, 383 U.S. 502, 86 S.Ct. 958, 16 L.Ed. 2d 56 (1966). The appellants, however, challenge two portions of the charge. The first portion challenged dealt with the determination of community standards:

"In determining the common conscience of the community, you are to consider the community as a whole, young and old, educated and uneducated, the religious and irreligious, men, women, and children, from all walks of life, in all sections of the country."

We find no error in this charge. It makes it clear that the community as a whole is to be considered in determining what its standards are. It does not put any undue emphasis on the fact that children are part of this community. See Butler v. Michigan, 352 U.S. 380, 77 S.Ct. 524, 1 L.Ed.2d 412 (1957).[10]

■ A second portion of the charge complained of related to the small percentage of the material which might be deemed as appealing to persons with deviant sexual interests. The Court, after dealing with the general requirement that in order to be obscene, material must have prurient appeal, stated:

"Some of the material charged as obscene deals with sexual conduct that deviates from normal heterosexual conduct, such as lesbianism and homosexuality. Where the material is designed for a clearly defined deviate sexual group rather than to the public at large, the prurient appeal requirement is satisfied if the dominant theme of the material taken as a whole appeals to the prurient interest in sex of the members of that group" (R. 1927).

It is claimed that this charge is deficient in that it fails to state that the special rule charged is applicable only if there is independent proof that the material was designed for and primarily disseminated to a clearly defined sexual group. This claim is without merit. Under Mishkin v. New York, *supra*, this variation of the prurient interest requirement applies where the "probable recipient group" consists of deviates. This would surely be true whenever, in the words of the charge "the material is designed for a clearly defined deviate sexual group."

---

10. This charge puts slightly less emphasis on children in defining the nature of the community than did the charge in United States v. Roth, *supra*, which stated that: "[t]he community as a whole is the proper consideration. In this community, our society, we have children of all ages, psychotics, feeble minded and other susceptible elements. Just as they cannot set the pace for the average adult reader's taste, they cannot be overlooked as part of the community." See Ginzberg v. United States, 383 U.S. 463, 465, n. 3, 86 S.Ct. 942 (1966).

*Exclusion From Evidence of Comparable Material Offered on the Issue of Community Standards*

The appellants sought to introduce evidence supposedly relevant on the issue of community standards. This evidence included materials purchased in Los Angeles which the defendants offered to prove were also available in other major metropolitan areas, material purchased in New York City, films showing in New York City and the Report of the Commission on Obscenity and Pornography.

The appellants do not contest that under United States v. Wild, 422 F.2d 34 (2d Cir. 1969), cert. denied, 402 U.S. 986, 91 S.Ct. 1644, 29 L.Ed.2d 152 (1971), it was not necessary for the government to introduce evidence on the issue of community standards in view of the "hard core" nature of the materials.

Of course, the appellants had the right to introduce evidence on community standards. The question is whether the evidence offered by the appellants was proper evidence on this issue. We conclude, as did the trial Court, that it was not.

Evidence of mere availability of similar materials is not by itself sufficiently probative of community standards to be admissible in the absence of proof that the material enjoys a reasonable degree of community acceptance. Womack v. United States, 111 U.S.App. D.C. 8, 294 F.2d 204, 206 (1961), cert. denied, 365 U.S. 859, 81 S.Ct. 826, 5 L.Ed.2d 822 (1961). Such proof would normally be supplied by expert witnesses. No such proof was offered. In the absence of this foundation, the allegedly similar pornographic material was properly excluded. Mere availability of similar material by itself means nothing more than that other persons are engaged in similar activities.

As to the Report of the Commission on Obscenity and Pornography, it was properly excluded as in large part irrelevant and as usurping the function of the jury. Introduction of such material is not a proper substitute for the testimony of expert witnesses whose opinions can be tested by appropriate cross examination.

### IV.

### EVIDENCE SEIZED INCIDENT TO PORTELA'S ARREST

Portela challenges the admission into evidence of certain items seized in his apartment on July 23, 1969, when he was arrested there pursuant to a warrant. His sole challenge to this search is that it was not conducted in accordance with the restrictive standards of Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), decided one month earlier. We are in full agreement with Judge MacMahon's opinion denying Portela's motion to suppress this evidence. See United States v. Manarite, 314 F.Supp. 607, 613–616 (S.D.N.Y.1970). A tear gas gun, a bag containing photographs and a bag containing ammunition was found in a bar within six inches of where Portela was standing at the time they were seized. Two address books and a bag containing what Portela described as "hard core" film was found on the bar. Additional matter including a gun and .32 caliber ammunition was found in closets to which the agents went at the request of Mrs. Portela to get for her a dress and a raincoat. Other material, including Western Union money order receipts and copies of "Color Climax" were found near an end table near which several unidentified persons were standing. The F.B.I. agents were justified in assuming that these persons might be accomplices of those arrested and hence might attempt to destroy evidence or procure a weapon on behalf of appellants. This was an obvious possibility in view of the fact that a gun had already been found on the premises. Thus, as Judge MacMahon found, the search and seizure incident to the July 23 arrest were entirely within the scope of *Chimel.*

## V.

### USE OF HEARSAY EVIDENCE BY THE GRAND JURY

 The indictment herein is challenged on the ground that it was based in part on hearsay testimony. The grand jury was shown the magazines and other printed material involved in this case, but was not shown the movies. Appellants' contention that the jury should have viewed some or all of the hundreds of films involved in this case is entirely unwarranted especially in view of the fact that the content of the films was described to them in competent testimony. See Costello v. United States, 350 U.S. 359, 363, 76 S.Ct. 406, 100 L. Ed. 397 (1956). There was no reason for the grand jury to view the films. They had a sufficient description of them and could call for their display if they felt it necessary to do so.

## VI.

### CONSTITUTIONALITY OF § 1465

 The appellants claim that, on its face, or as applied, § 1465 is unconstitutional, citing Stanley v. Georgia, 394 U. S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). However, the Supreme Court in United States v. Reidel, 402 U.S. 351, 91 S.Ct. 1410, 28 L.Ed.2d 813 (1971), upheld the constitutionality of § 1461 which forbids the mailing of pornographic material. The Supreme Court held that under United States v. Roth, *supra,* obscene materials are not protected by the first amendment, and that the limited right to receive pornography established by *Stanley* did not establish a corresponding right to sell such materials. *A fortiori,* it follows that § 1465, which specifically requires that the transportation in interstate commerce be "for the purpose of sale or distribution," is also constitutional.

 Alexander also claims that § 1465 is unconstitutional because of the

provision contained therein that the transportation of two or more copies of any publication or article or a combined total of five such publications or articles creates a presumption that such articles are intended for sale or distribution. Such a presumption is clearly valid as applied to this case where each delivery involved large numbers of magazines and/or films, usually in the thousands.

We have considered the other arguments raised by appellants and find them to be without merit.

The judgments appealed from are affirmed.