**Rocky L. FORDYCE and Aeros Entertainment Corporation, Appellants (Defendants),**

v.

**STATE of Indiana, Appellee (Plaintiff).**

No. 48A02–8906–CR–00263.

Court of Appeals of Indiana, Second District.

March 28, 1991.

Patrick Murphy, Geoffrey B. Yelton, Anderson, for appellants.

Linley E. Pearson, Atty. Gen., Gary Damon Secrest, Deputy Atty. Gen., Indianapolis, for appellee.

BUCHANAN, Judge.

## CASE SUMMARY

Appellants-defendants Rocky L. Fordyce and Aeros Entertainment Corporation (hereinafter collectively referred to as Fordyce) appeal their convictions for distributing obscene matter that describes sexual conduct involving a person under sixteen years of age,[1] a class D felony, claiming Indiana's obscenity statute violates both the United States and Indiana Constitutions, that the court erred in not admitting a comparable book into evidence, and that the evidence was insufficient to support the obscenity conviction and the enhancement of the offense to a felony.

We affirm.

## FACTS

On September 10, 1987, Officer Rick Griner of the Anderson Police Department entered the Aeros Adult Bookstore in down-town Anderson where he purchased two paperback books entitled *Incest Mommy* and *Dog Fun For Daughter.*

The book *Incest Mommy* tells a story of a mother seducing her son for his first sexual experience and details various sexual activities that take place between the two. *Dog Fun For Daughter* describes a teenage girl, her mother, and a friend of the girl, and the sexual experiences they have with a German Shepherd and a Doberman Pinscher. *Dog Fun For Daughter* also features a teenage boy who makes obscene calls to the daughter and her mother, and then, at the conclusion of the book, shows up to engage in a sexual romp with the mother.

The stories in both books are fictional. The books contain no photographs, but consist only of text and advertisements for various adult products. While *Dog Fun For Daughter* refers to certain characters as "teens" and "teenagers," no specific age is provided. *Incest Mommy* is even less specific; while the book refers to certain childlike traits exhibited by the son, i.e. his "racing" around the house, his lack of physical development, etc., there is no direct indication of the age of the characters.

Based on the content of the books, Fordyce was arrested and charged with selling obscene materials which depicted or described persons under sixteen years of age. Following a jury trial, Fordyce was convicted and given a three year sentence and ordered to pay a $5,000 fine or, in the alternative, make a $5,000 contribution to charity. All but sixty days of the sentence was suspended.

## ISSUES

Fordyce raises several issues for our consideration, which we restate as follows:

1. Whether Indiana's obscenity statute violates the first and ninth Amendments of the United States Constitution?

2. Whether Indiana's obscenity statute violates Article I, Section 9 of Indiana's Constitution?

---

1. Ind.Code 35–49–3–1(2) (1988).

3. Whether the court erred by not admitting into evidence a book comparable to the ones alleged to be obscene?

4. Whether the evidence was sufficient to support the conviction?

5. Whether the evidence was sufficient to support the enhancement of Fordyce's sentence?

■ The dissenting opinion raises sua sponte the appropriateness of the trial court's charitable option sentencing order and concludes that it was improper for the reasons addressed in Judge Sullivan's dissenting opinion in *Campbell v. State* (1990), Ind.App., 551 N.E.2d 1164, a case in which the defendant, as here, did not directly raise the issue. We are aware of no authority deeming a charitable option sentencing order to be *fundamental error*, and therefore consider the issue to be waived by Fordyce's failure to raise it on appeal. *See Prentice v. State* (1985), Ind., 474 N.E.2d 496.

## DECISION

■ ISSUE ONE—Whether Indiana's statutory definition of obscenity violates the first and ninth Amendments · of the United States Constitution?

PARTIES' CONTENTIONS—Fordyce claims that due to recent modifications made by the United States Supreme Court to the *Miller* obscenity standard in *Pope v. Illinois* [2], Indiana's statutory definition of obscenity now violates the first and ninth Amendments of the United States Constitution. The State responds that Fordyce's analysis is based on minority positions taken by certain justices and that those views do not represent a reversal of the *Miller* standard.

CONCLUSION—Indiana's statute does not violate the first and ninth Amendments to the United States Constitution.

The genesis of Indiana's statutory definition of obscenity is the tripartite test developed by the United States Supreme Court

in *Miller v. California* (1973), 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419:

"The basic guidelines for the trier of fact must be: (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest, *Kois v. Wisconsin, supra* [408 U.S. 229] at 230 [92 S.Ct. 2245, 2246, 33 L.Ed.2d 312 (1972)], quoting *Roth v. United States, supra* [354 U.S. 476] at 489 [77 S.Ct. 1304, 1311, 1 L.Ed.2d 1498 (1957)]; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value."

*Miller*, 413 U.S. at 24, 93 S.Ct. at 2615.

Shortly thereafter, the Indiana legislature codified almost verbatim the *Miller* obscenity standard. *See* 1975 Ind.Acts Pub.L. No. 341–1975. Only slightly revised once since its original enactment,[3] IC 35–49–2–1 (1988) now provides:

Sec. 1. A matter or performance is obscene for purposes of this article if:

(1) the average person, applying contemporary community standards, finds that the dominant theme of the matter or performance, taken as a whole, appeals to the prurient interest in sex;

(2) the matter or performance depicts or describes, in a patently offensive way, sexual conduct; and

(3) the matter or performance, taken as a whole, lacks serious literary, artistic, political, or scientific value.

Fordyce asserts that *Pope* renders unconstitutional Indiana's statutory definition of obscenity. Reaching far he cites Justice Scalia's concurrence and Justice Stevens' dissent in *Pope* as a basis for reexamining the *Miller* obscenity standard, an examination he claims should lead this court to conclude that our statutory definition of obscenity violates the first and ninth

---

**2.** *Pope v. Illinois,* (1987), 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439.

**3.** *See* 1978 Ind.Acts Pub.L. No. 148.

Amendments of the United States Constitution.

In our opinion, *Pope* does not vitiate the *Miller* obscenity standard. It merely clarifies that while the first two prongs of the *Miller* test are to be applied with reference to community standards, the third prong is to be utilized by employing a "reasonable person" test:

> "[t]he proper inquiry is not whether an ordinary member of any given community would find serious literary, artistic, political, or scientific value in allegedly obscene material, *but whether a reasonable person would find such value in the material, taken as a whole.*"

*Pope*, 481 U.S. at 500–01, 107 S.Ct. at 1921 (emphasis supplied).

The jury in this case was instructed in accordance with the *Miller* obscenity standard as clarified by *Pope*,[4] *record* at 133, which was perfectly proper. Fordyce does not contend the instruction was incorrect, but argues that having been so instructed the jury could not have reached the conclusion the books were obscene. He offers no compelling reasoning for this conclusion or for his assertion that *Pope*, which reaffirms the *Miller* obscenity standard, makes unconstitutional Indiana's definition of obscenity which is based on the *Miller* standard. He merely reweighs the evidence.

■ ISSUE TWO—Whether Indiana's obscenity statute violates Article I, Section 9 of Indiana's Constitution?

PARTIES' CONTENTIONS—Fordyce and the Indiana Civil Liberties Union (ICLU)[5] argue that obscenity is protected speech under the free speech clause of Indiana's Constitution and that, therefore, Indiana's statute criminalizing the dissemination of obscene materials is unconstitutional. The State responds that, even adopting the historical analysis urged by Fordyce and the ICLU, obscene speech is not protected by Indiana's Constitution.

CONCLUSION—Indiana's obscenity statute does not violate the free speech clause of Indiana's Constitution.

Article I, Section 9, of the Indiana Constitution provides:

> "No law shall be passed restraining the free interchange of thought and opinion, or restricting the right to speak, write, or print, freely, on any subject whatever; but for the abuse of that right, every person shall be responsible."

Fordyce and the ICLU urge that this court adopt an interpretation of this clause similar to that reached by the Oregon supreme court in *State v. Robertson* (1982), 293 Or. 402, 649 P.2d 569. Taking an historical approach, the Oregon supreme court concluded that Oregon's Constitution prohibits the enactment of any law, backed by punitive sanctions, which forbids speech or writing unless it can be shown that the prohibition falls within an historically established exception to Oregon's free speech guarantee. *Robertson, supra.*[6]

The Oregon supreme court later applied this analysis to the issue of obscenity and concluded that a statute making the dissemination of obscene materials a crime was unconstitutional because obscene expression does not fall within any historical exception to the plain wording of the Ore-

---

**4.** The jury was instructed:

> "Just as the ideas a work represents need not obtain majority approval to merit protection, neither, insofar as the First Amendment is concerned, does the value of the work vary from community to community based on the degree of local acceptance it has won. The proper inquiry is not whether an ordinary member of any given community would find serious literary, artistic, political or scientific value in allegedly obscene material, but whether a reasonable person would find such value in the material, taken as a whole. Of course, the mere fact that only a minority of a population may believe a work has serious

value does not mean the 'reasonable person' standard would not be met.
> *Pope v. Illinois*, 1987 [481 U.S. 497, 107 S.Ct. 1918], 95 L.Ed.2d 439."

**5.** The Indiana Civil Liberties Union filed an amicus curiae brief in support of Fordyce on this issue.

**6.** Article I, Section 8, of the Oregon Constitution provides:

> "No law shall be passed restraining the free expression of opinion, or restricting the right to speak, write, or print freely on any subject whatever; but every person shall be responsible for the abuse of this right."

gon Constitution. *Oregon v. Henry* (1987), 302 Or. 510, 732 P.2d 9. Thus, the Oregon supreme court concluded that because restrictions on sexually explicit and obscene expression between adults were not well established at the time Oregon's Constitution was adopted, obscenity was not an historical exception to freedom of speech, and, thus constitutes protected speech under Oregon's Constitution.

By this precedent, Fordyce and the ICLU would have us apply the Oregon analysis to conclude that the framers of Indiana's current constitution did not intend for obscenity to be an exception to the free speech guarantee. In support they cite the fact that obscenity was never discussed as an exception to the free speech clause during the debate on this subject and argue that at the time the Constitution was drafted, Indiana did not have a consistent tradition of regulating obscenity. In addition, they contend that because the language employed in the free speech clause can be traced to the Indiana Constitution of 1816,[7] other state constitutions of earlier vintages, and even the 1789 French Declaration of the Rights of Man and Citizen, the framers of Indiana's free speech clause intended to adopt the principles embodied in those earlier guarantees, including the protection afforded obscene expression.

They reach too far. First, it hardly seems significant that obscenity was not discussed as an exception to the free speech clause at Indiana's Constitutional Convention of 1851. *See Journal of the Convention of the State of Indiana to Amend the Constitution* (1851). Such an omission is understandable in view of the overall task involved in adopting a new constitution. Statutes regulating obscenity were already in place in Indiana. *See* Laws of Indiana, 1843, Chapter 53, Article III, Section 122, and in other states which had similar free speech provisions in their constitutions.[8]

Indiana had a consistent tradition of regulating obscenity prior to 1851. In 1843, the Indiana legislature enacted a statute to restrict the dissemination of obscene materials:

"Sect. 122. If any person shall vend, or cause to be vended, any playing cards, or any obscene book, pamphlet, or print, he shall, on conviction thereof, be fined in any sum not less than one dollar nor more than three dollars for every such pack of cards, book, pamphlet, or print vended."

Laws of Indiana, 1843, Chapter 53, Article III, Section 122.

In 1852, one year after the adoption of Indiana's current constitution, this statute was reenacted as part of a comprehensive criminal code:

"Sec. 52. Every person who shall by himself or agent, print, vend, exhibit or circulate any obscene book, pamphlet, print or picture, shall upon conviction, be fined not exceeding five hundred dollars, and if the exhibition be made to a female, imprisonment not exceeding three months may be added.

Sec. 53. All persons engaged in vending, circulating or exhibiting or in any way preparing such obscene book, pamphlet, print or picture, shall be deemed, and punished as principals."

Ind.Rev.Stat., 1852, Chapter 8, *Misdemeanors* §§ 52–53.

Although the legislature did not provide a statutory definition of the term "obscene," an examination of dictionaries from that era shows that one dictionary defined the term as "immodest; disgusting" and defined "obscenity" as "impurity of thought or language; lewdness." *Walker's Critical Pronouncing Dictionary and Expositer of the English Language* (1844). *Webster's Dictionary* (1856) defined "obscene" as "offensive to chastity and delicacy; impure; expressing or presenting to the mind or view something which delicacy, purity, and decency forbid to be exposed;

---

7. Indiana's first constitution was adopted in 1816. Its second and current constitution was adopted in 1851.

8. For example, *see* Michigan Const. of 1850, art. IV, § 42 and Mich.Rev.Stat., titl. XXX, ch. 158, §§ 13–14 (1846); La.Const. of 1845, Title VI, art. 110 and La.Penal Code, Crimes & Punishments, Title XVI, ch. II, art. 340 (1833).

as obscene language; obscene pictures." Obviously our forefathers were concerned with the degrading effects of obscenity on society.

The enactment of obscenity statutes before and immediately following Indiana's adoption of its current constitution provides compelling evidence that obscenity was not intended to be cloaked with the protection of the free speech clause. Our conclusion is not without persuasive precedent. In *People v. Ford* (1989), Colo., 773 P.2d 1059, the Colorado supreme court addressed the issue of whether its obscenity statute violated the free speech clause of its constitution, which clause is similar to the one contained in both Oregon's and Indiana's Constitutions.[9] The Colorado court observed that at the time its constitution was written, obscenity proscriptions were prevalent and the dissemination of obscene materials was prohibited in other jurisdictions which had adopted constitutional provisions similar or identical to Colorado's. Because of this historical background, the Colorado supreme court concluded that the framers of its constitution did not consider obscenity to be constitutionally protected speech. *Ford, supra.*

Fordyce and the ICLU have failed to meet the burden required to rebut the presumption that Indiana's statute regulating obscenity is constitutional. *See Miller v. State* (1987), Ind., 517 N.E.2d 64.

■ ISSUE THREE—Whether the court erred by not admitting a book, comparable to the offending material, into evidence in order to demonstrate community acceptance of the books?

PARTIES' CONTENTIONS—Fordyce argues that the trial court erred in not admitting a comparable book which he claims had been accepted by the community. The State counters that the use of sales figures, by itself, is not sufficient to show that the community had accepted the

book, and that any error in excluding the book was harmless because a substantially similar book to the excluded book was admitted into evidence.

CONCLUSION—The trial court did not err in refusing to admit a comparable book into evidence.

■ A trial court's decision to exclude evidence which is arguably relevant will not be reversed unless there is a showing that the trial court's discretion was manifestly abused and that the defendant was denied a fair trial. *Jackson v. State* (1986), Ind., 490 N.E.2d 1115. To establish a foundation for the admission of comparison evidence on the issue of community standards, there must be a showing that the proffered evidence (1) is similar to the material in issue, and (2) enjoys a reasonable degree of community acceptance. *Van Sant v. State* (1988), Ind.App., 523 N.E.2d 229; *United States v. Womack* (D.C.Cir.1974), 509 F.2d 368, *cert. denied* (1975), 422 U.S. 1022, 95 S.Ct. 2644, 45 L.Ed.2d 681; *See also Saliba v. State* (1985), Ind.App., 475 N.E.2d 1181, *trans. denied,* Ind., 484 N.E.2d 1295.

In this case, the trial court concluded that the content of the proffered book, *My Secret Garden,* was substantially similar to that contained in *Dog Fun For Daughter* and *Incest Mommy.* However, the trial court found that Fordyce had failed to establish community acceptance of *My Secret Garden.*

At trial, Fordyce compared sales figures of *My Secret Garden* to other books which he claimed time had deemed to be classics.[10] Fordyce introduced evidence that over a nineteen month period one store in Anderson sold twenty copies of *My Secret Garden,* a sales figure higher than any of the six classics sold at the same store over the same period of time. *Record* at 772. Additionally, over the same nineteen month period, 15,389 copies of *My Secret Garden*

---

9. Article II, Section 10, of the Colorado Constitution provides:

"No law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty ..."

10. The classics which Fordyce compared *My Secret Garden* to were *Anne Frank: Diary of a Young Girl, Red Badge of Courage, Canterbury Tales, Of Mice and Men, To Kill a Mockingbird,* and *Romeo and Juliet.*

were sold nationwide. *Record* at 772. This, Fordyce claims shows the book was two-and-a-half times more popular in Madison County than nationwide, thus indicating the book had been "accepted" in Madison County.

We need not decide whether the sales figures offered by Fordyce establish that *My Secret Garden* was accepted by the community and, therefore, should have been admitted into evidence as comparison materials. Although Fordyce contends the exclusion of the book prevented the jury from accurately determining community standards with respect to obscenity, the trial court did admit a book entitled *In The Babysitter's Behind* (Exhibit F), as a comparable book accepted by the community. The exclusion of evidence is not erroneous if substantially similar evidence is subsequently introduced and admitted. *Underwood v. State* (1989), Ind., 535 N.E.2d 118. Fordyce has failed to show he was prejudiced by the trial court's decision to exclude *My Secret Garden* from evidence.

 ISSUE FOUR—Whether the evidence was sufficient to support the conviction for distributing obscene matter?

PARTIES' CONTENTIONS—Fordyce argues that the State failed to offer evidence of community standards, or to show that no reasonable person would find value in the books. The State says that such proof is not necessary.

CONCLUSION—The evidence was sufficient to support the conviction for distributing obscene matter. Despite Fordyce's arguments to the contrary, the State is not required to submit expert testimony in an obscenity case. *Van Sant, supra; Saliba, supra.* The obscenity determination may be based solely on the jury's viewing of the allegedly offensive material. *Van Sant, supra; Saliba, supra.* In this case both of the books, which contain explicit descriptions of various sexual activities including bestiality, rape, incest, and sodomy, were admitted into evidence and available for the jury to review. Surely, the jury had ample evidence before it to conclude the books were obscene.

 ISSUE FIVE—Whether the evidence was sufficient to support the trial court's conclusion that the books depicted or described a person under 16 years of age?

PARTIES' CONTENTIONS—Fordyce urges this court to conclude that the enhancement portion of Indiana's obscenity statute should only be applied to obscene matter which depicts or describes "real" persons under the age of sixteen. In the alternative, Fordyce asserts that the evidence fails to show that the characters in the book were below sixteen years of age. The State counters that the enhancement provision should not be limited to just actual persons and that the evidence sufficiently established that the characters were younger than sixteen.

CONCLUSION—The enhancement portion of Indiana's obscenity statute applies to fictional as well as real people, and the evidence was sufficient for the jury to conclude that the people described in the books were under sixteen years of age.

Before deciding whether the evidence is sufficient to support the enhancement of Fordyce's sentence, we need to interpret IC 35–49–3–1:

"A person who knowingly or intentionally:

(1) sends or brings into Indiana obscene matter for sale or distribution; or

(2) offers to distribute, distributes, or exhibits to another person obscene matter; commits a Class A misdemeanor. However, the offense is a Class D felony if the obscene matter *depicts or describes sexual conduct involving any person who is or appears to be under sixteen (16) years of age.*"

(Emphasis supplied.)

Here there is no showing that the characters described in *Incest Mommy* and *Dog Fun For Daughter* were in any way based on actual living human beings. Rather, it is uncontested that the characters are figments of the imagination of the authors.

Given that premise, Fordyce focuses on the word "person" used in the statute and argues that it should be interpreted to

mean "actual persons" who are or appear to be below sixteen years of age. *Appellee's Brief* at 22. The State, however, draws our attention to the language "depicts or describes" as used in the statute and provides a dictionary definition of "depicts" as "to form a likeness of by drawing or painting ... to represent, portray, or delineate in other ways than in drawing or painting." *Appellant's Brief* at 8, quoting *Webster's Third New International Dictionary* (Merriam–Webster 1986).

The fundamental rule of construction is that a statute must be construed to give effect to legislative intent. *State ex rel. Bynum v. LaPorte Superior Court* (1973), 259 Ind. 647, 291 N.E.2d 355. We are to construe a statute according to its plain meaning, *St. Germain v. State* (1977), 267 Ind. 252, 369 N.E.2d 931, and words and phrases are to be taken in their plain, ordinary and usual sense unless a different purpose is manifested by the statute itself. *Overlade v. Wells* (1955), 234 Ind. 436, 127 N.E.2d 686.

And so we look at the word "person" interpreted by Fordyce. Our construction of the statute militates against a keyhole view which focuses on only one word. Rather, it is the phrase "depicts or describes a person who is or appears to be below sixteen years of age," which should be examined. Taking the plain and ordinary meaning of this language, it would seem that the legislature intended the enhancement portion of the statute to apply to situations in which the obscene matter *describes* human beings below a certain age. Clearly the characters portrayed in *Dog Fun For Daughter* and *Incest Mommy* were represented as human beings and, thus, fall within the plain meaning of IC 35–49–3–1. There is nothing to indicate that the legislature specifically or by inference intended the enhancement portion of the statute not to apply to situations involving the dissemination of obscene material based in fiction.

So now we must determine whether the evidence sufficiently establishes that the characters in the obscene books "are or appear to be under sixteen years of age."

The book *Incest Mommy* describes an incestuous relationship between a boy called "Johnny" and his "mommy." In the book, the mother scolds her son for "racing" through the house and almost knocking a laundry basket out of her arms. *Record* at 342–43. Later the mother tells Johnny that he is "getting to be a big boy." *Record* at 344. During the course of Johnny's seduction, the author describes the "scant hair" which had begun to "sprout" in Johnny's pubic region. *Record* at 352.

In *Dog Fun For Daughter* the author refers to the main character Kathy Ross as a "young girl" who is "face[d] [with] the fragile moment between childhood and maturity" and is "trying to find out what makes her budding body tick...." *Record* at 423. The book also refers to her and two other characters as a "teenager" and "teen." *Record* at 423, 463, 478.

While neither book explicitly indicates the age of the characters, it is only necessary that an inference may be drawn from the evidence which will support the factfinder's conclusion. *See Woodson v. State* (1989), Ind., 542 N.E.2d 1331. With respect to *Incest Mommy* and *Dog Fun For Daughter* an unmistakable inference can be drawn that the books describe a young boy and young girl on the threshold of puberty and under sixteen years of age. Under such circumstances, the evidence supports the enhancement of Fordyce's sentence.

Judgment affirmed.

SHIELDS, P.J., concurs.

SULLIVAN, J., concurs in part and dissents in part with opinion.

SULLIVAN, Judge, concurring in part and dissenting in part.

I fully concur as to Issues Two, Four, and Five.

I.

As to Issue One, I concur in the refusal to strike down the Indiana statutory definition of obscenity as violative of the U.S. Constitution. In doing so, however, I state

my belief that the position articulated by Fordyce concerning the implications of *Pope v. Illinois* (1986) 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439, appears to have merit and is deserving of consideration by the Indiana Supreme Court. In this regard, I see no value in making a detailed analysis at the intermediate appellate stage but would observe that the *Pope* decision casts doubt upon that portion of the Indiana statute which implies that "the average person" is the determiner of all three components of the obscenity test. With reference to the third test, or "literary value" test, for obscenity, the majority opinion in *Pope* stated:

"The proper inquiry is not whether an ordinary member of any given community would find serious literary ... value in allegedly obscene material, but whether a reasonable person would find such value...." 107 S.Ct. at 1921.

In applying the "prurient interest" component of the test for obscenity, the jury may view the material with reference to its appeal to a particularized "deviant sexual group." *Mishkin v. New York* (1966) 383 U.S. 502, 86 S.Ct. 958, 16 L.Ed.2d 56. That same narrow focus is not, however, permissible in determining community acceptance or community standards. The latter determinations must be made in terms of the "average" person. As stated in *United States v. Womack* (1974 D.C.Cir.) 509 F.2d 368, *cert. denied* 422 U.S. 1022, 95 S.Ct. 2644, 45 L.Ed.2d 681:

"The [contemporary community] standards of [an area in which there are a number of shops which deal in pornographic materials] are not the standards to be applied in this case, any more than the standards of the most straight-laced persons." 509 F.2d at 380.

As noted, *Pope v. Illinois, supra,* clearly states that the redeeming value component must be determined not by reference to community standards nor by the "average" or "ordinary" person but by whether a "reasonable" person would find such value. To the extent that "ordinary" equates with "average" as used in our statute, the matter is worthy of clarification, if not a declaration of unconstitutionality.

## II.

I concur as to Issue Three but upon the ground that the discretion of the trial court to admit or reject comparative evidence is virtually unrestrained. *See Hamling v. United States* (1974) 418 U.S. 87, 94 S.Ct. 2887, 2912, 41 L.Ed.2d 590. For this reason, exclusion of the book "My Secret Garden" was not reversible error, even though in my view, the trial court wrongly found that the book had not received sufficient community acceptance to be admitted as comparative evidence.

"Acceptance", as used in connection with the admissibility of comparison evidence in obscenity cases, is a relative term. In order to be admissible, the work need not be accepted by all, by a majority, or even by a substantial number. It is only necessary that the foundation disclose "a reasonable degree of community acceptance". *Van Sant v. State* (1988) 1st Dist.Ind.App., 523 N.E.2d 229, 239. What is, or is not, a reasonable degree is nebulous and without precise boundaries. *United States v. Pinkus* (1978) 9th Cir., 579 F.2d 1174, *cert. dismissed* 439 U.S. 999, 99 S.Ct. 605, 58 L.Ed.2d 674.

The community acceptance prong of the test is admittedly difficult to apply and the standards are ill-defined. The test requires a delicate balancing of the likelihood that the evidence will be of some assistance to the jury against the tendency of the proffered evidence to confuse the jury. *See* Federal Rules of Evidence 403.

Nevertheless, in my view, if error is to be made in this very elusive assessment, it should be made in favor of admitting the evidence so that it might be considered by the jury in its difficult task of determining obscenity in the light of the applicable community standards.

In its ruling as to admissibility, the trial court correctly stated that the purpose of comparison evidence in an obscenity case "is to assist the jury in trying to arrive at a community standard." Record at 754. *Huffman v. United States* (1971) D.C.App.,

470 F.2d 386, *reh. granted upon unrelated issues,* 502 F.2d 419.

In *Pierce v. State* (1974) 292 Ala. 473, 296 So.2d 218, the Alabama Supreme Court discussed the foundational requirements for comparative evidence and by parenthetical comment suggested how the "community acceptance" prong of the admissibility test might be met. It is appropriate I believe to quote extensively from Chief Justice Heflin's majority opinion:

> "In *United States v. Manarite,* 448 F.2d 583 (2d Cir.1971) the Second Circuit Court of Appeals addressed this problem:
>
>> 'Evidence of mere availability of similar materials is not by itself sufficiently probative of community standards to be admissible *in the absence of proof that the material enjoys a reasonable degree of community acceptance. Womack v. United States,* 111 U.S.App.D.C. 8, 294 F.2d 204, 206 (1961), cert. denied, 365 U.S. 859, 81 S.Ct. 826, 5 L.Ed.2d 822 (1961). Such proof would normally be supplied by expert witnesses. No such proof was offered. In the absence of this foundation, the allegedly similar pornographic material was properly excluded. Mere availability of similar material by itself means nothing more than that other persons are engaged in similar activities.'

The underlying rationale of this position has been stated by the late Mr. Justice Harlan:

> '[T]he trier of an obscenity case must take into account "contemporary community standards," *Roth v. United States,* 354 U.S. 476, 489, 77 S.Ct. 1304 [1311], 1 L.Ed.2d 1498 .... The community cannot, where liberty of speech and press are at issue, condemn that which it generally tolerates.' *Smith v. California,* 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959) (Harlan, J., concurring in part and dissenting in part).

See also *Yudkin v. State,* 229 Md. 223, 182 A.2d 798 (1962) (Trier of fact has the 'right to read, or be informed of, the contents of comparable books that have been generally accepted or tolerated by the public.')

Therefore, once the proper predicate has been laid by demonstrating to the trial court's satisfaction that the matter offered as evidence of contemporary standards enjoys a reasonable degree of acceptance or tolerance (*either by way of expert testimony, volume of sales, or other means) the matter should be admitted.* (Emphasis supplied.)

This is not to hold, however, that every *book* or photograph proffered must be admitted. The admission of a large number of different items alleged to be comparable to the matter in question might make the trial unmanageably complex and lengthy and would amount to no more than cumulative evidence. Therefore, while the trial court must admit evidence of community standards after a proper predicate has been established, the volume of such evidence must be left to the sound discretion of the trial court, and this court will not review the trial court's decision on this issue except for an abuse of discretion." 296 So.2d 218.

Similarly, in *Flynt v. State* (1980) 153 Ga.App. 232, 264 S.E.2d 669, *cert. denied* 449 U.S. 888, 101 S.Ct. 245, 66 L.Ed.2d 114, the court held:

> "The rationale behind the admission of 'comparative' evidence is to allow the defendant in an obscenity case the opportunity to attempt to persuade the trier of fact that the challenged material does not exceed contemporary community standards, as represented by the comparable material and against which the challenged material is judged. The comparative material is tangible evidence of contemporary community standards.
>
> \* \* \* \* \* \*
>
> Such evidence ... would show 'community acceptance' of material 'similar' to that distributed by the defendant and thus would have bearing on the issue before the jury—whether the defendant knowingly distributed obscene material." 264 S.E.2d at 674.

This court's *Van Sant* decision, *supra,* follows the conventional wisdom that avail-

ability of comparative material does not equate with community acceptance. In the same vein, *Saliba v. State* (1985) 2d Dist. Ind.App., 475 N.E.2d 1181, somewhat more specifically states that "distribution data must be viewed with caution" because it is difficult to fix the precise point at which sales of a publication denote a relative degree of public acceptance. 475 N.E.2d at 1191.

In making its ruling as to "My Secret Garden," the trial court said:

"... the only figure we have is from one bookstore of about twenty copies ... I don't think twenty copies in nineteen months, again, establishes a reasonable acceptance in the Madison County community." Record at 773.

The court disregarded for acceptance purposes the comparative sales of several books considered as "classics" because they were not of the same type, i.e., sexually explicit. The court erred in its reasoning. The "reasonable degree of acceptance" test is separate and distinct from the similarity test. Application of the test for admissibility consists of two steps. If materials are not similar in content, the analysis proceeds no further. If the similarity prong of the test is met, only then does the trial court proceed to determine whether the comparison publication has received a reasonable degree of community acceptance. At this stage, the similarity of content is not a factor. The trial court merely determines whether the comparison material has attained the requisite degree of acceptance. In doing so, comparison with dissimilar material is permissible.

Although it would be improper to find a comparison publication accepted in the community merely because it has received greater sales than some other kind of publication, if the latter publication is known to be commonly accepted, such comparison may be made. If the comparison material has received greater sales in the community than the commonly accepted publication it certainly would seem to dictate a conclusion that it has received the requisite degree of community acceptance. For example, if a comparison publication were to have sold more copies in a community during a brief current period than a popular weekly or monthly publication such as Sports Illustrated or Reader's Digest, it stands to reason that the comparison publication has achieved a reasonable degree of community acceptance.

Nevertheless, comparison of sales between the books here involved and the "classics" set forth in footnote 10 of the majority opinion is not helpful. This is so because literary works which are clearly and unmistakably accepted may have received such wide acceptance over a period of time as to be already found in a substantial number of private libraries. Possessors of the work have no need to purchase another copy of it. Sales figures for a given recent time period therefore may not be truly reflective of the degree of community acceptance. It was not error for the trial court to reject defendant's argument that because sales of "My Secret Garden" exceeded sales of the classics for a relatively brief period, the former had received community acceptance in the same or greater degree than the six classic works enumerated.

A different analysis must be given to the comparative sales figures of "My Secret Garden" in the Madison County area as opposed to national sales of the same book.

In *Flynt, supra,* 153 Ga.App. 232, 264 S.E.2d 669, as in *Pierce, supra,* it was acknowledged that sales figures may be used to demonstrate community acceptance. In *Flynt,* however, the court held that community acceptance had not been shown because the figures reflected mere distribution to retail establishments not consumer sales. Such distribution figures might suffice if coupled with the number of books returned from the retailer to the distributor but in *Flynt* that evidence was not offered. The *Flynt* court reasoned, therefore, that the defendants had established, at best, mere availability. The sales figures in evidence here are decidedly different than those considered by the Georgia Court of Appeals in *Flynt, supra.*

Here, the sales figures for "My Secret Garden" reflected total sales (books distrib-

uted less returns) during the nineteen month period in a single store in Madison County. Total per capita national sales were shown to be two and one-half times less. In my estimation, such comparative figures lead to the inescapable conclusion that the community of Madison County and perhaps the immediate environs had "accepted" the book at least to a degree which exceeded the nation's acceptance. That degree of acceptance should have prompted the court to find that "My Secret Garden" had received the reasonable degree of acceptance necessary for admission into evidence. Even so, I am unable to say that the foundational evidence was so compelling or conclusive as to require the court, as a matter of law, to admit the Exhibit. *Commonwealth v. Dane Entertainment Services* (1983) 389 Mass. 902, 452 N.E.2d 1126. In any event, the error if any in excluding "My Secret Garden" was harmless because a book, even more similar in content, was admitted into evidence for comparative purposes.

As to Exhibit "F" which was admitted into evidence,[1] the foundation witness, an adult book distributor, testified before the jury that in a typical month approximately sixteen copies of books of that type and fifteen per month of a different type but almost identical in content were sold. In nine months in 1988, in Madison County 878 total copies of that type book were sold. This was the only evidence, other than the exhibit itself which was offered as foundation for admission. The exhibit was admitted and the jury read the exhibit.

Admission of comparative evidence to show community standards is not determinative. The trier of fact may disregard that evidence insofar as it is offered to establish the standard. *City of Miami v.*

*Florida Literary Distributing Co.* (1986) Fla., 486 So.2d 569; *United States v. Various Articles of Obscene Merchandise, Schedule No. 2102* (1983 2d Cir.) 709 F.2d 132. It may well be that a particular jury might determine that even though the books are similar in content, one is obscene and the other is not. Or, they might decide, despite a threshold determination by the trial court that the comparison evidence has a degree of community acceptance, both publications are obscene.

I find no requirement in the law that dictates acquittal of an obscenity defendant merely because a comparable publication has been deemed, for admissibility purposes, to have a degree of acceptance. In applying contemporary community standards in their ultimate determination as to obscenity, the jury is not bound by the trial judge's view that with regard to admissibility, the comparison evidence has received a reasonable degree of acceptance. At least they are not so bound with regard to their assessment of the material alleged to be obscene. *See Saliba v. State, supra,* 475 N.E.2d 1181 (Sullivan J., concurring at 1192).

The community acceptance determination necessarily made by the trial court in admitting the comparative evidence is not binding upon the jury. It may be argued that the jury should not even be made aware of the admissibility test. But in some way the jury must be advised of the manner in which they are to make the comparison and what permissible conclusions may flow from that comparison.

In none of the instructions given here was the jury told of their function or duty in reading and comparing Exhibit F with the books covered by the charges. The jury did have before it the definition of

1. In admitting Defendant's Exhibit F for comparative purposes, the trial court erroneously interpreted the community acceptance test for admissibility to relate "not to the entire community, but to the community that reads this type of a book." *Record* at 755.

The "community" for such purpose is not necessarily identical to the "community" by which are gauged contemporary standards for obscenity. However, for both purposes admissibility of comparison evidence and the ultimate determi-

nation of obscenity, the "community" is not so narrow as to embrace only areas in which pornography abounds or persons who purchase and read such materials.

Acceptance by the community of certain material or establishment of a standard for materials within a community include persons who do not purchase or read such materials but who "accept" such material within the community for persons who may wish to do so.

obscenity which called for assessment of the subject material by "the average person, applying contemporary community standards." Record at 129. The jury was also instructed that the subject material must depict sexual conduct "in a patently offensive way ... that offends the contemporary standards." Record at 130. The jury was instructed that "contemporary community standards are determined by what the community as a whole in fact finds acceptable" (Record at 131) and the jury was told that "the *value* of a work [does not] vary from community to community based on the degree of local acceptance...." Record at 133. This instruction deals with the redeeming literary, artistic, political or scientific value of a work not with the definition of contemporary standards. It in effect instructs that the work may be protected even though it is patently offensive and contrary to contemporary community standards *IF* taken as a whole, it has serious literary, artistic, political or scientific value.

At no time, however, except during closing argument was the jury told or was there an implication that the comparison book had achieved a reasonable degree of community acceptance. More importantly, however, the jury was not instructed for what purpose or in what way the comparison was to be drawn and with what consequences or results.

The comparison reading done by the jury was done in a virtual vacuum. Without some guidelines or assistance, it would seem that merely being given a comparison novel, strikingly similar to the book alleged to be obscene and told to read it, aids the jury not at all. It would appear to merely invite the jury to read two books instead of one and to speculate about what purpose was served by reading the comparative book. Without guidance from the court, the jury is left to wonder: if they must find both books obscene before they may convict on the one involved in the charge; how similar the comparative book must be to be of value in their deliberations; and how to react if they determine that one book is obscene and the other is not.

In the final analysis, if comparison evidence has been admitted, the jury should in some manner be instructed as to its purpose or place in the guilt determining process.

### III.

The majority decision affirms the judgment in all respects. In this regard I must dissent and voice disapproval of those portions of the judgment which provide for charitable contributions of Five Thousand Dollars in lieu of the Five Thousand Dollar fines imposed upon both defendants. Such alternatives are improper and might well constitute a violation of Canon 2 of the Code of Judicial Conduct. Advisory Opinion of the Indiana Commission on Judicial Qualification (December 16, 1986). *See Campbell v. State* (1990) 4th Dist., Ind App., 551 N.E.2d 1164 (Sullivan, J. dissenting at 1170–1172). They should be discouraged whether or not challenged upon appeal.